**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
jglatt@bursor.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

EVAN WOOTEN and SARKIS OGANYAN, individually and on behalf all others similarly situated,

Plaintiffs,

vs.

BIOLIFE PLASMA SERVICES L.P. and TAKEDA PHARMACEUTICALS U.S.A., INC.

Defendants.

Case No. 1:25-cv-00099-KES-SKO

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

PAGE

NATURE OF THE ACTION ..... 1

THE PARTIES ..... 2

JURISDICTION AND VENUE ..... 3

FACTUAL ALLEGATIONS ..... 5

I. BACKGROUND ON CIPA ..... 5

A. CIPA § 631(a) – Wiretapping And Eavesdropping ..... 5

B. CIPA § 638.51(a) – Pen Registers And Trap And Trace Devices ..... 7

II. DEFENDANTS VIOLATE THE CIPA ..... 8

A. Testing Reveals That Defendants Installed Third Party Trackers On Its Website And Enabled These Third Parties To Intercept And/Or Collect The Information Of Prospective Donors ..... 8

B. The Third Parties Collect Or Intercept Prospective Donors' E-Mail Addresses Prior To Creating Their Accounts ..... 11

C. The Third Parties Collect Or Intercept Prospective Donors' IP Addresses Prior To Creating Their Accounts ..... 15

D. Defendants' Conduct Enables The Third Parties To Bridge Users' Identities Across Multiple Websites And Apps ..... 18

III. DEFENDANTS INSTALL THE THIRD PARTY TRACKERS ON THEIR WEBSITE FOR MARKETING, ADVERTISING, AND DATA ANALYTICS PURPOSES ..... 21

A. Defendants Enabled Salesforce, Via The Evergage SaaS, To Intercept User Information For Marketing, Advertising, And Analytics ..... 21

B. Defendants Enabled SnapChat, Via The Snapchat Pixel, To Intercept User Information For Marketing, Advertising, And Analytics ..... 24

CAUSES OF ACTION ..... 28

COUNT I ..... 28

COUNT II ..... 30

PRAYER FOR RELIEF ..... 31

JURY DEMAND ..... 31

Plaintiffs Evan Wooten and Sarkis Oganyan ("Plaintiffs") brings this action on behalf of themselves and all others similarly situated against Defendants BioLife Plasma Services L.P. ("BioLife") and Takeda Pharmaceuticals U.S.A., Inc. ("Takeda") (collectively, "Defendants"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action suit brought against Defendants for wiretapping the electronic communications—including the "routing, addressing, or signaling information"—of users of Defendants' BioLife Plasma Services Website (the "Website").

2. Specifically, Defendants installed trackers operated by Snapchat and Salesforce (the "Third Parties") on the Website. Through these Trackers, the Third Parties collect users' personal information—including users' e-mail addresses, home zip codes, and IP addresses—*before* a user completes the account registration process or otherwise ostensibly consents to any collection of their information. Defendants use the information collected by these Third Parties—and therefore, aid, agree with, employ, or otherwise enable the Third Parties' conduct—for data analytics and marketing purposes.

3. Plaintiffs present two alternative theories of liability that preclude Defendants' conduct. If Plaintiffs' interactions with the Website are the "contents" of their communications (because users affirmatively input this information), then Defendant aided, agreed with, employed, or otherwise enabled the interception of Plaintiffs' and Website users' communications without consent in violation of Section 631 of the California Invasion of Privacy Act ("CIPA").

4. Alternatively, if Plaintiffs' interactions with the Website are *not* "communications," however, then Defendants violated CIPA § 638.51(a) by installing a "pen register" (the Third Party trackers) that enabled the Third Parties to collect Plaintiffs' and Website users' "routing, addressing, or signaling information" (their e-mail addresses, home zip codes, and IP addresses) without consent.

5. In either case, Plaintiffs bring this action on behalf of a proposed Class of Website users who created a BioLife account through the Website and had their information and communications intercepted by the Third Parties.

## THE PARTIES

6. Plaintiff Evan Wooten is a citizen of California and resident of Fresno, California. In or around February 2023, Plaintiff Wooten created a BioLife account through his Google Chrome browser while in California. In creating his account, Plaintiff input the necessary information, including his e-mail address. Plaintiff Wooten continued to access his account through both Defendants' Website as recently as November 2024. Prior to completing his account creation process, the Third-Party trackers installed on Defendants' Website allowed the Third Parties—as aided, agreed with, and employed by Defendants—to intercept and collect Plaintiff's e-mail address and IP address. Plaintiff Wooten did not consent to the collection of his e-mail address and IP address prior to completing the account creation process, nor was he aware that these activities were occurring. Defendants used the information intercepted and collected by the Third Parties for marketing, advertising, and analytics purposes.

7. At the time Plaintiff Wooten created his account, he was never appraised of any Third-Party trackers located on Defendants' Website. He was never required to view, agree to, nor consent to any privacy policy at sign up. Plaintiff Wooten was likewise never appraised that the Website contained Third Party trackers each time he logged in to book an appointment and/or collect donation rewards. As such, Plaintiff Wooten had no reason to suspect that Defendants had installed Third Party trackers capable of using his inputs for their own marketing and business purposes. Neither Snapchat, Evergage, nor Salesforce are ever referenced in Defendants' Privacy Policy and, since Plaintiffs' Counsel had to conduct a "dynamic analysis" to discover their function on the Website, Plaintiff Wooten could not have reasonably discovered the violation on his own. Indeed, Plaintiff Wooten did not discover the violations until he sought more information from his Counsel on November 29, 2024.

8. Plaintiff Sarkis Oganyan is a citizen of California and resident of Van Nuys, California. On or about January 28, 2024, Plaintiff Oganyan created a BioLife account through his

web browser while in California. In creating his account, Plaintiff input the necessary information, including his e-mail address. Plaintiff Oganyan continued to access his account through Defendants' website as recently as February 2025. Prior to completing his account creation process, the Third-Party trackers installed on Defendants' Website allowed the Third Parties trackers—as aided, agreed with, and employed by Defendants—to intercept and collect Plaintiff's e-mail address and IP address. Plaintiff Oganyan did not consent to the collection of his e-mail address and IP address prior to completing the account creation process, nor was he aware that these activities were occurring. Defendants used the information interpreted and collected by the Third Parties for marketing, advertising, and analytics purposes.

9. At the time Plaintiff Oganyan created his account, he was never appraised of any Third-Party trackers located on Defendants' Website. He was never required to view, agree to, nor consent to any privacy policy at sign up. Plaintiff Oganyan was likewise never appraised that the Website contained Third Party trackers each time he logged in to book an appointment and/or collect donation rewards. As such, Plaintiff Oganyan had no reason to suspect that Defendants had installed Third Party trackers capable of using his inputs for their own marketing and business purposes. Neither Snapchat, Evergage, nor Salesforce are ever referenced in Defendants' Privacy Policy and, since Plaintiffs' Counsel had to conduct a "dynamic analysis" to discover their function on the Website, Plaintiff Oganyan could not have reasonably discovered the violation on his own. Indeed, Plaintiff Oganyan did not discover the violations until he sought more information from his Counsel in or about April 2025.

10. Defendant BioLife Plasma Services L.P. is a Pennsylvania limited partnership with its principal place of business in Deerfield, Illinois.

11. Defendant Takeda Pharmaceuticals U.S.A., Inc. is a Delaware corporation with its principal place of business in Cambridge, Massachusetts. Takeda is the parent company of BioLife.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are more than 100 class

members, and at least one member of the proposed class is a citizen of a state different from Defendants.

13. Defendant BioLife is an "unincorporated association" under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), and Defendant BioLife is therefore "a citizen of the State where it has its principal place of business [Illinois] and the State under whose laws it is organized [Pennsylvania]." *See* 28 U.S.C. § 1332(d)(10).

14. This Court has personal jurisdiction over Defendants. *First*, Defendants operate 20 plasma donation centers in California, including eight in this District alone.[1] Thus, Defendants have purposefully availed themselves of the privilege of doing business in California. *Second*, Defendants' Website (and the Third Parties' interception of information thereon) is directly linked to Defendants' physical operations in California, in that consumers create accounts and schedule appointments for Defendants' California locations on the Website. Thus, the conduct at issue here is directly related to Defendants' business in California. *See Kauffman v. Papa John's Int'l, Inc.*, 2024 WL 171363, at *3-4 (S.D. Cal. Jan. 12, 2024). Indeed, Defendants operate more than 20 BioLife Plasma donation centers throughout California that a consumer must have created an account to receive rewards and benefits.

15. By electing to place its donation centers in California, Defendants therefore operate their Website with the intent of causing donors in California (like Plaintiffs), to create an account on the Website they have placed the Third-Party Trackers. By doing so, Defendants intentionally require consumers create an account through their Website, thereby extracting personally identifying information from California residents (including IP addresses) so that those donors can then use their services in California. Thus, the conduct is expressly aimed at California as Defendants learned the IP addresses coming from California which Defendants. Indeed, Defendants caused the Third-Party trackers to be installed on Plaintiffs' browsers after Plaintiffs accessed the Website. As such, Defendants collect IP addresses from California residents and therefore knowingly and intentionally collected data from California residents. *See Briskin v. Shopify, Inc.*, --- F.4th ---, 2025 WL 1154075,

[1] LOCATIONS, https://www.biolifeplasma.com/locations/california.

at *11-13 (9th Cir. Apr. 21, 2025). *Finally*, Plaintiffs and Class Members were harmed in California because that is where the Third Parties—as enabled by Defendants—intercepted Plaintiffs' and Class Members' information.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### I. BACKGROUND ON CIPA

17. The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Pen. Code § 630.

18. As the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—*the right to control the nature and extent of the firsthand dissemination of his statements*.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

19. Individuals may bring an action against the violator of any provision of the CIPA for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

20. Defendants violated two distinct provisions of the CIPA: CIPA § 631(a) and CIPA § 638.51(a). Both are discussed in turn below.

#### A. CIPA § 631(a) – Wiretapping And Eavesdropping

21. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability

under CIPA § 631(a), a plaintiff need only establish that the defendants, "by means of any machine, instrument, contrivance, or in any other manner," do any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electronically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employes, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

22. CIPA § 631(a)'s applicability is not limited to phone lines. CIPA also applies to "new technologies" like computers, the internet, and email. *See Matera v. Google, Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications."); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F. 3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of internet browsing history).

23. The California Supreme Court has repeatedly stated an "express objective" of CIPA § 631(a) is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas*, 38 Cal. 3d at 364 (emphasis added). "Indeed, it is probable that the Legislature viewed section 631 as a means of proscribing attempts to circumvent other aspects of the Privacy Act, *e.g.*, by requesting a

secretary to secretly transcribe a conversation over an extension, rather than tape recording it in violation of section 632." *Id.* at 361.

24. Crucially here, CIPA § 631(a) requires consent to an interception to occur *before* the interception itself occurs, not after. *Javier*, 2022 WL 1744107, at *2 ("[W]e conclude that the California Supreme Court would interpret Section 631(a) to require the prior consent of all parties to a communication."); *see also Ribas*, 38 Cal. 3d at 361 ("The Privacy Act has been read to require the assent of all parties to a communication *before another may listen*.") (emphasis added).

**B. CIPA § 638.51(a) – Pen Registers And Trap And Trace Devices**

25. CIPA § 638.51(a) proscribes any "person" from "intall[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

26. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Pen. Code § 638.50(b).

27. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Pen. Code § 638.50(b).

28. In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information. For example, if a user sends an e-mail address, a "pen register" might record the email address it was sent from because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace devices" may record the email address it was sent from because this is *incoming* information that is being sent to the same user.

29. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. However, although CIPA was enacted before the day of the internet, "the California Supreme Court regularly reads statutes to apply

to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc*., 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013).

30. Thus, based on the expansive language of the statute and the legislative purpose behind CIPA, courts have held that CIPA § 638.50 applies to trackers or third-party services that collect user information on the Internet. *See*, *e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers that collected users' IP addresses were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in pace at the time the statues were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3 (N.D. Cal. Dec. 12, 2024); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register"); *Moody v. C2 Educ. Sys. Inc.* 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51.").

31. This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

## II. DEFENDANTS VIOLATE THE CIPA

### A. Testing Reveals That Defendants Installed Third Party Trackers On Its Website And Enabled These Third Parties To Intercept And/Or Collect The Information Of Prospective Donors

32. Defendants operate more than 200 blood plasma donation centers across the U.S. These centers serve "hundreds of thousands" of monthly donors.[2] In exchange for donations, donors receive monetary compensation credited to their BioLife account. The money in that account can then be used as any debit card, allowing the donor to make purchases through their account "wherever Debit Mastercard is accepted."[3]

---

[2] WHY CHOOSE BIOLIFE?, https://www.biolifeplasma.com/.

[3] *Id.*

33. A prospective donor cannot donate until they have made a BioLife account. To make the account, the prospective donor can sign up on Defendants' Website.

34. In November 2024, Plaintiffs' Counsel retained a private research company to review Defendants' Website. The researchers conducted a "dynamic analysis" of data transmissions. A "dynamic analysis" records the transmissions that occur from a user's device.

35. The private researchers tested what information (if any) is collected by third parties when a user creates an account on the Website.

36. To make Defendants' Websites load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendants' server where the relevant Website data is stored. In response to the request, Defendants' server sends an "HTTP response" back to the browser with a set of instructions. A general diagram of this process is pictured below, which explains how Defendants' Websites transmit instructions back to a user's browser in response to an HTTP request:




37. The server's instructions include how to properly display each Website—*e.g.*, what images to load, what text should appear, or what music should play. In addition, the server's instructions cause the trackers to be installed on a user's browser. The trackers then cause the browser to send identifying information to the Third Parties as the user's communications with the Website.

38. The analysis first established that Defendants installed at least two third party trackers on the Website: (i) Evergage, which is owned and operated by Salesforce, (ii) and the SnapChat Pixel, which is owned and operated by Snap. Defendants integrate these third parties' "software development kits" ("SDK") and "application programming interfaces" ("API") into their Website.

39. An SDK is a "set of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[4]

40. An API "acts an intermediary layer that processes data transfer between systems, letting companies open their application data and functionality to external third-party developers [and] business partners."[5] An API can "work[] as a standalone solution or included within an SDK … [A]n SDK often contains at least one API."[6] APIs "enable[] companies to open up their applications' [or websites'] data and functionality to external third-party developers, business partners, and internal departments within their companies."[7]

41. When signing up for an account through the Website, prospective donors are presented with this screen, which is step one of three in the account creation process:


First Name *

Last Name *

Email Address *

Zip Code *

* Indicates a required field

By providing my contact information, I agree that the information I provided may be used in the donation process. For more information on how BioLife processes my personal information I can go to the BioLife Privacy Notice.

To change my communication preferences I can log into my account and go to my Settings.

Next

---

[4] API vs. SDK: The Difference Explained (With Examples), https://getstream.io/glossary/api-vs-sdk/.

[5] IBM, *What is an API?*, available https://www.ibm.com/topics/api.

[6] SDK vs. API: What's the Difference?, IBM (July 13, 2011), https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface).

[7] Application Programming Interface (API), https://www.ibm.com/cloud/learn/api.

42. The dynamic analysis found that once a user clicks "next" but *before* a user completes the account creation process, the Third Parties intercept the user's e-mail address and the fact that the user visited the Website. The Third Parties also acquire the user's IP address.


```
GET
https://biolifeplasmaservices.us-6.evergage.com/api2/event/prod_takeda?event=eyJhY3Rpb24iOiJDcmVhdGUgQWNjb3VudCBQYWdlIFZpc2l0ZWQiLCJpdGVtQWN0aW9uIjpudWxsLCJzb3VyY2UiOnsicGFnZVR5cGUiOiJDcmVhdGUgQWNjb3VudCIsImNvbnRlbnRab25lcyI6WyJ0cmlnZ2VyZWRsYXBzZV9wb3B1cCIsImV4aXRfaW50ZW50X2NyZWF0ZWFjY291bnQiXSwidXJsIjoiaHR0cHM6Ly93d3cuYmlvbGlmZXBsYXNtYS5jb20vY3JlYXRlLWFjY291bnQiLCJ1cmxSZWZlcnJlciI6IiIsImNoYW5uZWwiOiJXZWIiLCJiZWFjb25WZXJzaW9uIjoxNiwiY29uZmlnVmVyc2lvbiI6IjQzIn0sImZsYWdzIjp7InBhZ2VWaWV3Ijp0cnVlfSwidXNlciI6eyJhdHRyaWJ1dGVzIjp7ImVtYWlsQWRkcmVzcyI6ImMuY2hhbWVsZW9uNDJAZ21haWwuY29tIn0sImFub25JZCI6ImE5NmI2ZTJiMzRkZDdlOTAifSwicGVyZm9ybWFuY2UiOnt9LCJkZWJ1ZyI6eyJleHBsYW5hdGlvbnMiOnRydWV9LCJjYXRhbG9nIjp7fSwiY29uc2VudHMiOltdLCJhY2NvdW50Ijp7fSwiX3Rvb2xzRXZlbnRMaW5rSWQiOiI5ODQyOTYwMTU3NDY5MzYifQ==

BASE64 decoding:
{"action":"Create Account Page Visited","itemAction":null,"source":{"pageType":"Create Account","contentZones":["triggeredlapse_popup","exit_intent_createaccount"],"url":"https://www.biolifeplasma.com/create-account","urlReferrer":"","channel":"Web","beaconVersion":16,"configVersion":"43"},"flags":{"pageView":true},"user":{"attributes":{"emailAddress":"c.chameleon42@gmail.com"},"anonId":"a96b6e2b34dd7e90"},"performance":{},"debug":{"explanations":true},"catalog":{},"consents":[],"account":{},"_toolsEventLinkId":"984296015746936"}
```


Evergage (plain email)


```
POST https://tr.snapchat.com/p

PostData:
  bt: 1d53c387
  c1: cf14a0aa-e3fe-45eb-87c5-cd77b8ec21d2
  lc: 924203ef-a672-421f-8a26-c45b11da62e0
  ls: 8ab22068-1efb-4e8c-b685-080420995608
  r: 38cbc968-e3d5-48b2-beb4-8110d80a8043
  si:
Mc3PFKCq4_7r6wfFzXe47CHSi58gIZ2wIvSKsiBoHvuFjPaFCAQgmVYIRj2g78i9lbjBWRSIb5MEC-aCQckGXbTLjdSUDxlVKt6SQgPvpnIcH2smxFsR2mLgXs2DZlA0YjI4y8lo49W1si20gRDYCoBD9EZJ7wFg
  ss: c1591488-6f93-4e0b-a982-41c9065db4cb
  bg: False
  df: True
  sh: 1050
  sw: 1680
  ua: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/131.0.0.0 Safari/537.36
  url: https://www.biolifeplasma.com/registration
  v: 3.34.0-2411121854
  …
  cbt:
  req: {'pc': {'av': 5, 'pids': ['337c79b5-f92d-4b7e-b1cd-d4feb6ab189f'], 'u_hems': '408bfb842dff98802863b402d5e3a35f819ab7e149a6935309849fdc74418bde'}, 'del': 11} {'md': {'btx': 'Next', 'pids': ['337c79b5-f92d-4b7e-b1cd-d4feb6ab189f']}, 'del': 11}
  u_scsid: c1591488-6f93-4e0b-a982-41c9065db4cb
```


Snapchat (hashed email)

43. During the account-creation process, the user is not routed or redirected to a third-party server; all inputs are, as far as consumers like Plaintiffs are aware, contained within Defendants' account creation steps within their Website. As such, Defendants receive the user's provided information before the Third Party trackers.

**B. The Third Parties Collect Or Intercept Prospective Donors' E-Mail Addresses Prior To Creating Their Accounts**

44. The dynamic analysis demonstrated that the Third Parties, through their respective trackers, collect and/or intercept prospective donors' e-mail addresses prior to the end of the account creation process.

45. An email address is a unique string of characters that designates an electronic mailbox.

46. As industry leaders,[8] trade groups,[9] and courts[10] agree, an ordinary person can use an email address to uniquely identify another individual. Indeed, there exists multiple services that enable anyone with internet access and a credit card to look up who owns a particular email address.

47. Both Salesforce and Snap, through their respective trackers, collect and/or intercept users' e-mail addresses. As to Salesforce, it acquires a user's e-mail address (and the entire transmission) in Base64 format. However, this is trivial to decode, as multiple, publicly available websites exist that enable such decoding.[11]

48. To decode the transmission, all one needs to do is paste the transmission into one of the many public decoders, which will turn the transmission into plain text and reveal the user's e-mail and other information. The following shows this process using the transmission to Salesforce:




[8] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[9] NETWORK ADVERTISING INITIATIVE, NAI CODE OF CONDUCT 19 (2020), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[10] *See United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

[11] *See*, *e.g.*, https://www.base64decode.org/.

49. Given that even an ordinary person can decode this transmission with ease, a multi-billion technology company like Salesforce certainly can. Indeed, Salesforce offers a service called AMPscript, which allows a website operator to "send highly personalized messages across the communication channels that Marketing Cloud engagement supports."[12]

50. Within its suite of tools provided by AMPscript is Base64Decode that "[d]ecodes a Base64 encoded string to a plain text string."[13]

**Example**

This sample code takes a Base64 encoded string passed to the function and returns a plain text string.

```
var encoded = 'VGhpcyB3YXMgYSBCYXNlNjQgZW5jb2RlZCBzdHJpbmcu';
var decoded = Base64Decode(encoded); // "This was a Base64 encoded string."
```

51. This shows that Salesforce is capable of reading and learning the data in its Base64 form. And as discussed in greater detail below, JavaScript's browser settings render it plausible that Base64 transmissions are read and understood in real time by the Third Party.

52. Similarly, Snap receives the user's e-mail in Sha256 format through the Snapchat Pixel. This conversion is called "hashing." But before converting the e-mail into Sha256 format, Snapchat reviews the content to ensure that it is an e-mail address that requires hashing. Snapchat calls this its "Automated Matching" function,[14] which is explained in greater detail below. But suffice it to say, Snap must read the content of the message to determine if an e-mail address is being sent to apply the hashing.

53. Even in hashed form, however, e-mail addresses are traceable to individuals. The FTC has noted that "hashing is vastly overrated as an 'anonymization' technique … the casual

[12] SALESFORCE, *AMPscript Function Reference*, https://developer.salesforce.com/docs/marketing/marketing-cloud-ampscript/references/mc-ampscript-references/mc-ampscript-references.html.

[13] SALESFORCE, *Base64Decode*, https://developer.salesforce.com/docs/marketing/marketing-cloud/guide/ssjs_utilitiesBase64Decode.html.

[14] SNAP PIXEL FAQS, *What is Automated Matching?* https://businesshelp.snapchat.com/s/article/pixel-faqs?language=en_US.

assumption that hashing is sufficient to anonymize data *is risky at best, and usually wrong*."[15] And just as recently as July of 2024, the FTC stated again that "hashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."[16]

54. Hashed e-mails can be decrypted because there are a number of commonly-used methods to decrypt hashed emails including, for instance, a "'dictionary attack.'"[17] This is easy for Snap to perform because it acquires users' e-mail addresses through its social media platform. This is because the hash "remains the same no matter if the email address is used on different platforms, browsers, or devices,"[18] and Snap, as the assignor of the hashing, is capable of decoding its own hashing and matching that email with its records.

55. In other words, Snap can hash the e-mail addresses it receives on its social media platform and match those hashes to the ones it receives from the Website, as the hashes will be identical. As such, because Snap reads users' e-mail addresses in the first instance to determine if it must be hashed, and because Snap can match that assigned hashing with already-assigned hash string to the matching e-mail it already has, Snap both learns the contents of the communication in transit from Defendants' Website and can reaffirm its reading once the data has arrived to Snap.

56. Accordingly, the Third Parties intercept prospective donors' e-mail addresses, which are "routing, addressing, or signaling information" because the e-mail addresses identify the sender of the communication (*i.e.*, "outgoing" information).

---

[15] Ed Felten, *Does Hashing Make Data "Anonymous"?*, Federal Trade Commission (Apr. 22, 2012), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous (emphasis added).

[16] *No, Hashing Still Doesn't Making Your Data Anonymous*, Federal Trade Commission (July 24, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous.

[17] SHA256 ENCRYPT/DECRYPT, 100L5, https://10015.io/tools/sha256-encrypt-decrypt#google_vignette (last visited Aug. 29, 2024) (defining dictionary attacks as "[u]s[ing] a predefined list or database").

[18] Suryanarayan Pal, *What Is A Hashed Email Address and How It Can Benefit Email Marketers*, MAILMODO (Nov. 10, 2024) *available* https://www.mailmodo.com/guides/hashed-email-address/.

### C. The Third Parties Collect Or Intercept Prospective Donors' IP Addresses Prior To Creating Their Accounts

57. By virtue of receiving communications from the Website, the Third Parties also receive prospective donors' IP addresses.

58. An IP address is a unique set of numbers assigned to a device on a network, which is typically expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132). The traditional format of IP addresses is called IPv4, which has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[19]

59. An IP address is assigned by an Internet Service Provider ("ISP") and is unique globally. IP addresses are required for devices that need direct internet access.

60. While IP addresses are unique, they are not necessarily "public" simply because they are freely accessible. If an individual is not actively sending data packets out, the IP address remains private and is not broadcast to the wider internet. In other words, just because a homeowner chose to open the blinds to their street-facing window for sunlight, does not make their home activity per se public.

61. IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the IP address. This geolocation capability is leveraged by online advertising and user identification services.

62. Through an IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined. Thus, knowing a user's IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[20]

---

[19] *See, e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

[20] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

63. An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[21] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[22] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[23] because "[c]ompanies can use an IP address … to personally identify individuals."[24]

64. In fact, an IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[25] For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[26]

65. "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[27]

66. "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather

---

[21] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[22] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/yn9jcy5b.

[23] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://web.archive.org/web/20231209011353/https://www.accudata.com/blog/ip-targeting/.

[24] Trey Titone, *The Future Of Ip Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[25] *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[26] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[27] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

than relying on more general demographics or behavioral data."[28]

67. In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[29] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[30]

68. In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[31] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[32]

69. For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[33]

70. An IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

71. An IP address is also "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[34]

//

//

//

//

---

[28] *Id.*

[29] Williams, *supra*, https://tinyurl.com/yn9jcy5b.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.

[34] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

### D. Defendants' Conduct Enables The Third Parties To Bridge Users' Identities Across Multiple Websites And Apps

72. "ID Bridging" is the process of "piecing together different bits of information about" a user "to confidently infer that it is the same individual accessing a publisher's site or sites from various devices or browsers."[35]




73. ID Bridging "has long been the foundation of programmatic advertising,"[36] which is the process by which companies "use [] advertising technology to buy and sell digital ads" by "serv[ing] up relevant ad impressions to audiences through automated steps, in less than a second."[37] It entails a "unique identifier[] assigned to individual devices," including personal information like geolocation, e-mail addresses, and "cross-platform linkage."[38]

74. Salesforce, for example, maintains "unique identifiers from external systems, such as an ERP[39], marketing automation platform, or another CRM [that] are stored in custom or standard

---

[35] Kayleigh Barber, *WTF Is The Difference Between Id Bridging And Id Spoofing?*, DIGIDAY (July 8, 2024, https://digiday.com/media/wtf-is-the-difference-between-id-bridging-and-id-spoofing/.

[36] https://www.adexchanger.com/data-driven-thinking/how-can-id-bridging-the-foundation-of-our-space-suddenly-be-a-bad-thing/.

[37] PROGRAMMATIC ADVERTISING, https://advertising.amazon.com/blog/programmatic-advertising#.

[38] Anete Jodzevica, *ID Bridging: The Privacy-First Future of Audience Targeting*, SETUPAD (Nov. 15, 2024), https://setupad.com/blog/id-bridging/. Ironically, the example given in this article is a "hashed e-mail," where the e-mail Defendant collected in this example is not hashed.

[39] ERP stands for "Enterprise Resource Planning" and describes software used by a business to manage critical infrastructure in a single place, such as customer relations, sales, HR information, and finance management. As SAP describes it, "[a]n ERP software system acts as an enterprise's central nervous system, helping efficiently manage all these crucial processes and operations by connecting them together in an integrated system."

fields in Salesforce called External IDs. They link Salesforce records and the corresponding records in various other systems, allowing for effective synchronization and data interchange."[40] A CRM "stands for customer relationship management, which is a system for managing all of [a] … company's interactions with current and potential customers. … [It is] software that helps track each interaction [a company has] with a prospect or customer."[41] Most importantly, "CRM tools can unify customer and company data from many sources and even use AI (artificial intelligence) to help better manage relationships[.]"[42]

75. Snap likewise uses "advertising partners [to] share data about customers, and Snapchat admits to freely swapping [user] info for additional details with their ad partners, app developers, and publishers."[43] Among other purposes, "the information is used to verify [users'] identity, [and] enhance their services[.]"[44]

76. There are two primary forms of ID bridging. First is "Probabilistic Matching" which uses "complex algorithms to analyze signals like IP addresses … and browsing behavior."[45] The other is "Deterministic Matching" which is "often based on hashed emails [and] offers a more accurate method of identification."[46] Given that Defendants aid and abet in the interception of both IP addresses and e-mails, both methods of ID bridging are applicable.

77. Accordingly, the Third-Party trackers' have the information necessary to essentially follow Plaintiffs and the Class Members all over the internet and feed them advertisements merely

---

[40] S2 LABS, *External ID in Salesforce*, HTTPS://S2-LABS.COM/ADMIN-TUTORIALS/EXTERNAL-ID-RECORD-ID-SECURITY-TOKEN/#:~:TEXT=BENEFITS%20OF%20EXTERNAL%20ID&TEXT=IMPROVED%20DATA%20ACCURACY%20AND%20CONSISTENCY,AND%20REFERENCE%20USING%20EXTERNAL%20IDENTIFIERS.

[41] SALESFORCE, *Let's Define CRM*, https://www.salesforce.com/crm/what-is-crm/

[42] *Id.*

[43] David Lukic, *Learn All About Snapchat's Privacy Policy*, ID STRONG (Mar. 18, 2022) https://www.idstrong.com/sentinel/snapchats-privacy-policy/.

[44] *Id.*

[45] Ekaterina Kachalova, *Protecting Privacy in the Cookieless Era – What Is ID Bridging and How to Protect Yourself*, ADGUARD (Feb. 4, 2024) https://adguard.com/en/blog/id-bridging-tracking-privacy.html#:~:text=The%20use%20of%20hashed%20email,like%20a%20hashed%20email%20address.

[46] *Id.*

because they created unrelated accounts through Defendants' Website. First, even though Plaintiffs' e-mails are hashed (though known to Snap as discussed), "[t]he use of hashed email addresses for user tracking can also play a significant role in what's known as 'ID bridging'" because, at bottom, "hasting still creates a unique signature that can be used to identify individuals across platforms."[47]

78. Second, bridging Plaintiffs' IP addresses provides similar advantages. This is because knowing the IP address gives insight into the location of the person. As such, "probabilistic matching increases the size of [a company's] database and enables [it] to cast a wider net with … marking campaigns. It can also … let companies target customers based on their interest in various topics or products in near real-time."[48] Accordingly, a person's real-time location and any products (and where they are sold) relevant to their location becomes valuable insight for advertisers.

79. Thus, ID Bridging is a money-making machine for advertisers and app developers. On the advertiser side, ID Bridging "increase the chances of an ad buying platform finding their inventory to be addressable and, therefore, maximizes their 'ad yields.'" And on the app developer side, "publishers can boost revenue from direct-sold campaigns by offering advertisers access to more defined and valuable audiences."[49] In other words, advertisers will be able to find users that are more directly and likely interested in what is being sold by having access to significantly more information. And app users' information will be more valuable (and therefore, bring in more money to app developers) because it is combined with a plethora of other information from various sources.

80. While those within the ID Bridging industry describe it as privacy-protective, it is anything but. As courts have noted, the "ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers" creates "dossiers which

[47] Ekaterina Kachalova, *Protecting Privacy in the Cookieless Era – What Is ID Bridging and How to Protect Yourself*, ADGUARD (Feb. 4, 2024) https://adguard.com/en/blog/id-bridging-tracking-privacy.html#:~:text=The%20use%20of%20hashed%20email,like%20a%20hashed%20email%20address.

[48] Anthony Rotio, *Deterministic vs. Probablistic Matching*, GROWTHLOOP (Mar. 8, 2024) https://www.growthloop.com/university/article/deterministic-vs-probabilistic-matching#:~:text=Probabilistic%20matching%20can%20assess%20information,they%20download%20from%20a%20website.

[49] Bennett Crumbling, *What Is 'ID Bridging' And How Publishers Use It To Grow Direct And Programmatic Revenue?*, OPTABLE (Aug. 22, 2024) https://www.optable.co/blog/what-is-id-bridging.

can be used to further invade [users] privacy by allowing third parties to learn intimate details of [users'] lives, and target them for advertising, political, and other purposes, ultimately harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them." *Katz-Lacabe v. Oracle Am., Inc.*, 688 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (cleaned up).

## III. DEFENDANTS INSTALL THE THIRD PARTY TRACKERS ON THEIR WEBSITE FOR MARKETING, ADVERTISING, AND DATA ANALYTICS PURPOSES

81. As described below, Defendants install, aid, agree, and employ the Third-Party trackers' collection of e-mail addresses and IP addresses so they can help Defendants with marketing, advertising, and analytics.

### A. Defendants Enabled Salesforce, Via The Evergage SaaS, To Intercept User Information For Marketing, Advertising, And Analytics

82. Evergage is a Software-as-a-Service (SaaS) that "enables marketers to ... engage[] across channels."[50] Specifically, "[c]ompanies use Everage to tailor interactions with customers and prospects [like prospective BioLife donors] to tailor interactions with customers and prospects to increase loyalty, engagement and conversations."[51] In addition, Evergage enables companies like Defendants to "visualize, track, and manage customer experiences with real-time interaction management."[52]

83. In 2020, Salesforce acquired Evergage, which it renamed the "Salesforce Marketing Cloud Personalization"[53] and incorporated into the Salesforce Marketing Cloud suite of products.[54] Salesforce advertises itself as "the #1 AI CRM [Customer Relations Manager] … [that] help[s]

---

[50] *Id.*

[51] Leo Ortega, *Evergage: The Real-Time Personalization and Customer Data Platform*, ISDI CRM, *available* https://isdicrm.com/evergage-the-real-time-personalization-and-customer-data-platform/.

[52] *Customer Lifecycle Engagement With Real-Time Interaction Management*, SALESFORCE, https://www.salesforce.com/video/7825550/.

[53] "SDK" stands for software development kit and "is a set of software-building tools for a specific program." *See* SDK vs. API: What's The Difference?, IBM (July 13, 2011), *available at* https://www.ibm.com/blog/sdk-vs-api/.

[54] PR Newswire, *Salesforce Acquires Everage, Will Use Personalization to Enhance Customer Data and Deliver More Relevant Experiences* (Feb. 7, 2020), *available at* https://www.prnewswire.com/.news-releases/salesforce-acquires-evergage-will-use-personalization-to-enhance-customer-data-and-deliver-more-relevant-experiences-301000691.html.

companies connect with customers in a whole new way."[55] Thus, Salesforce now itself provides and operates Evergage, and itself collects and intercepts all information acquired therethrough.

84. To operate, a website like Defendants' will install a "JavaScript icon [] [that] tracks the online behavior of [] web users. When a user accessed [the client's] website, the JavaScript icon places a first-party cookie on the user's browser, which sends data from that user back to Personalization."[56] Salesforce then "track[s] website visitor profile data and various user interactions on [its] website and send[s] that information to Salesforce."[57] "This data includes pages viewed, links clicked, time on site, number of visits, geolocation and referral source, as well as other personalized data [the client] wish[es] [Salesforce] to collect."[58]

85. Critically, built into JavaScript are the functions "btoa" and "atob." "btoa" stands for "binary to ASCII," and is the built-in function that encodes data in Base64.[59] The inverse, "btoa" is the built-in function that decodes Base64 data. "These two functions are built into JavaScript and all modern browsers [like Plaintiffs'] support them."[60]

86. Salesforce describes the Personalization platform as a "personalization engine … that ingests customer engagement and profile data, then—using machine learning and AI–determines relevant messages, segmentation, and content for each customer, based on their preferences and affinities. These insights can then be ingested into various marketing touchpoints to power the customer experience."[61]

---

[55] SALESFORCE, *Investor Relations*, available https://investor.salesforce.com/overview/default.aspx?utm_cta=website-data-warehouse-for-dummies-confirmation.

[56] Salesforce, *Website Customization*, *available at* https://help.salesforce.com/s/articleView?id=sf.mc_pers_web_sdk_integration.htm&type=5.

[57] *Id.*

[58] *Id.*

[59] Jeff Novotny, *JavaScript Decode Base64 String – A Developer's Guide*, AKAMAI CLOUD (Mar. 29, 2023) *available* https://www.linode.com/docs/guides/javascript-base-64-decode/.

[60] *Id.*

[61] SALESFORCE, *Marketing: How Can Salesforce Help You Personalize Every Engagement Across the Entire Customer Experience?* https://www.salesforce.com/marketing/personalization/.

87. Evergage also "ingests customer engagement and profile data, [and] then — using machine learning and AI — determines relevant messages, segmentation, and content for each customer, based on their preferences and affinities."[62]

88. Salesforce's partnership with Defendants enables Defendants to share collected data with Salesforce's Marketing Cloud Advertising software,[63] which "helps [] target [] digital advertising campaigns across multiple platforms [(i.e., Meta (Facebook), Instagram, Google Ads, LinkedIn, X (Twitter), Pinterest, and Snapchat)] with Advertising Audiences."[64]

89. Once Salesforce intercepts or collects the Website communications, it has the capability to use such information for its own purposes. Specifically, Website communications are sent to Salesforce's Einstein data intelligence platform, which leverages data from, among other programs, the Salesforce Marketing Cloud and Marketing Cloud Engagement (*i.e.*, Evergage).[65] Salesforce uses data that is submitted to Einstein to train the AI models that form the basis of some of its services (*i.e.*, "may be used to train AI models"), to improve the services it provides to all of its customers, and to develop new products and services for current customers.[66]

90. Thus, Salesforce has the capability to use the Website communications it intercepts and collects for its own purposes—*e.g.*, to improve its products and services, or to develop new products and services.

91. Accordingly, when clients like Defendants integrate the software onto their website, they can gather real-time data about customers to "[u]se AI to synthesize in-the-moment intent data as well as data about the entire history of [the client's] relationship with [its] customers to identify

---

[62] PERSONALIZATION, SALESFORCE, https://www.salesforce.com/marketing/personalization/.

[63] INTEGRATE PERSONALIZATION WITH ADVERTISING, SALESFORCE, https://help.salesforce.com/s/articleView?id=sf.mc_pers_salesforce_marketing_cloud_advertising.htm&type=5.

[64] ADVERTISING AUDIENCES, SALESFORCE, https://help.salesforce.com/s/articleView?id=sf.mc_ads_advertising_audiences.htm&type=5.

[65] EINSTEIN AND DATA USAGE, https://help.salesforce.com/s/articleView?id=sf.admin_einstein_features_data_usage.htm&type=5.

[66] *See*, *e.g*, EINSTEIN AND DATA USAGE IN MARKETING CLOUD, https://help.salesforce.com/s/articleView?id=mktg.mktg_einstein_data_usage.htm&type=5.

affinities, interests, and preferences [and] develop nuanced perspectives on [the client's] customers based on individual preferences and use these insights to deliver custom messaging and offers."[67]




### B. Defendants Enabled SnapChat, Via The Snapchat Pixel, To Intercept User Information For Marketing, Advertising, And Analytics

92. Snapchat is a social media and messaging application that "offers a range of APIs through its Snap Kit, Lens Studio, and Marketing API, allowing developers to integrate Snapchat's features into their own applications."[68] Snapchat's Marketing API "is used for creating, managing, and optimizing advertising campaigns on Snapchat, including for targeting, budding, and tracking ad performance."[69]

---

[67] CROSS-CHANNEL PERSONALIZATION, https://www.salesforce.com/marketing/personalization/.

[68] Charu Mitra Dubey, *Shapchat API: Developer Guide on How to Integrate Snapchat API*, PHYLLO (July 10, 2024), https://www.getphyllo.com/post/snapchat-api-guide.

[69] *Id.*

93. Specifically, the Snapchat Marketing tool "provides a programmable interface to interact with Snapchat's advertising tools. This API enables automated creation and management of ad campaigns, audience targeting, and performance analytics, which can be a boom for marketers seeking to streamline their Snapchat advertising workflows."[70]

94. At a high level, some of the features the Snapchat Pixel provides are the ability to "[c]reate custom and lookalike audiences based on your website activity to help reduce ad costs," and better "[u]nderstanding the success of your campaigns by tracking actions in real time."[71]

95. "Snap's advertising tools allow advertisers to provide Snap with data about their customers to improve their advertising campaigns."[72] With the Pixel websites can "add a piece of JavaScript to [their] web pages to send data to [Snapchat] when [their] pages are being accessed by visitors."[73]

96. As the dynamic analysis found, the Snapchat Pixel "may send … (hashed) email addresses, (hashed) phone numbers and/or device identifiers, IP addresses, cookie IDs, metadata, and browser/app information" to Snap.[74]

97. However, as Snap explains, Snap receives the non-hashed e-mail address in the first instance before hashing it through a process it calls "Automated Matching." Through "Automated Matching," Snap "will automatically attempt to detect and send Snap information about [] customers such as information from forms on [] website[s]"[75] like Defendants' account creation forms. At this point, Snap "hash[es] information [it] believes to be emails or phone numbers ***before*** they're sent to Snap in order to help protect users."[76]

---

[70] Pipedream, *Snapchat Marketing API Integrations*, available https://pipedream.com/apps/snapchat-marketing.

[71] SNAP PIXEL: POWER YOUR AD PERFORMANCE, https://tinyurl.com/4scawctx.

[72] Snapchat, *Snap Advertiser Privacy and Security FAQs*, BUSINESS HELP CENTER, *available* https://businesshelp.snapchat.com/s/article/snap-privacy-faq?language=en_US.

[73] *Id.*

[74] *Id.*

[75] SNAP PIXEL FAQS, *What is Automated Matching?* https://businesshelp.snapchat.com/s/article/pixel-faqs?language=en_US.

[76] *Id.* (emphasis added).

98. In other words, Snap necessarily reads and learns (or attempts to) the contents before receiving them but ***after*** being provided with them (*i.e.*, in transit from Defendants' Website to Snapchat) to determine if the communication is an e-mail that must be hashed.

99. The purpose of such transmissions is so companies like Defendants can better advertise and target consumers on Snap's social media platform by enabling Snap to learn who visits the companies' websites. This also benefits Snap, as it allows Snap to monetize its Snapchat social media platform through advertising revenue, and the better at targeting Snap is, the more companies like Defendants will pay to advertise on Snapchat.

100. Indeed, Snap provides various forms of targeted advertising based on the information it collects, including location and demographic targeting, e-mail based targeting, or targeting based on those similar to companies' "customer list or Pixel Custom Audience."[77] And, Snap will actually tell website operators like Defendants "how well your pixel setup matches events to Snapchat Accounts," enabling companies like Defendants to send further identifying information to Snap so it can better match website users to Snapchat accounts.[78]




**CLASS ALLEGATIONS**

101. **Class Definition.** Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action on behalf of themselves and a Class of all others similarly situated, defined as:

> All California residents who, during the Class Period, proceeded past the first of the BioLife account creation process on the Website

[77] MEET YOUR AUDIENCE, SNAPCHAT BUSINESS, https://tinyurl.com/knw6jdas

[78] SNAP PIXEL: POWER YOUR AD PERFORMANCE, https://tinyurl.com/4scawctx.

while in California and had their information collected and/or intercepted by a third party

102. Plaintiffs reserve the right to modify the Class definition or add additional subclasses as necessary prior to filing a motion for class certification.

103. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering any tolling, concealment, and/or accrual issues, and ending on the date of entry of judgment.

104. **Numerosity.** Class Members are so numerous that joinder of all Members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiffs at this time; however, it is estimated that there are thousands or millions of individuals in the Class. The identity of such membership is readily ascertainable from Defendants' records and non-party records.

105. **Typicality.** Plaintiffs' claims are typical of the claims of the Class because Plaintiffs used Defendants' Website to create a BioLife account and had their information intercepted by the Third Parties without his prior, express consent or knowledge. Plaintiffs' claims are therefore based on the same legal theories as the claims of the other Class Members.

106. **Adequacy.** Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiffs' interests coincide with, and are not antagonistic to, those of the Class Members. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally, and in the emerging field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

107. **Common Questions of Law and Fact Predominate/Well Defined Community of Interest.** Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendants' wrongful conduct. Questions of law and fact common to the Class include:

(a) Whether Defendants aided, agreed with, or employed Salesforce and Snap to track, collect, read, attempt to read, review, and/or record users' activities on Defendants' Website;

(b) Whether the Evergage SaaS and Snapchat Pixel are "pen registers";

(c) Whether the collected and intercepted information is considered "record" or "content" information;

(d) Whether Plaintiffs and the Class Members gave consent to the surreptitious collection and reading of their information; and

(e) Whether Plaintiffs and the Class Members are entitled to damages.

108. **Superiority.** Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs know of no specific difficulty in litigating this action that would preclude its maintenance as a class action.

## <u>CAUSES OF ACTION</u>

### <u>COUNT I</u>
### Violation of California's Information Privacy Act
### Cal. Pen. Code § 631(a)

109. Plaintiffs repeat the allegations contained in the forgoing paragraphs as if fully set forth herein.

110. Plaintiffs bring this claim individually and on behalf of the Class against Defendants.

111. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti,* 22 Cal. 3d at 192-93. Thus, to establish liability under CIPA § 631(a), a plaintiffs need only establish that the defendants, "by means of any machine, instrument, contrivance, or in any other manner," do any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

112. The Evergage software-as-a-service and Snapchat Pixel are "machine[s], instrument[s], contrivance[s], or … other manner[s]" used to engage in the prohibited conduct at issue here.

113. Salesforce and Snap are "separate legal entit[ies] that offer[] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Accordingly, Salesforce and Snap were third parties to any communication between Plaintiffs and Class Members, on the one hand, and Defendants' Website, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC,* 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023); *Yockey v. Salesforce, Inc.*, 745 F. Supp. 3d 945 (N.D. Cal. 2024).

114. At all relevant times, Salesforce and Snap willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiffs' and Class Members on the one hand, and Defendants' Website, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

115. At all relevant times, Defendants aided, agreed with, employed, or otherwise enabled Salesforce and Snap to intercept consumers' communications with Defendants on the Website and to accomplish the wrongful conduct at issue here.

116. Plaintiffs and Class Members did not consent to Salesforce's and Snap's intentional access, interception, reading, learning, recording, and collection of Plaintiffs' and Class Members' electronic communications. Nor did Plaintiffs and Class Members consent to Defendants' aiding, agreeing with, employing, or otherwise enabling Salesforce's and Snap's conduct.

117. Plaintiffs and Class Members were in California when they accessed the Website.

118. Pursuant to Cal. Pen. Code § 637.2, Plaintiffs and the Class Members have been injured by Defendants' violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendants' violations of CIPA § 631(a).

**COUNT II**
**Violation of California Invasion of Privacy Act**
**Cal. Pen. Code § 638.51(a)**

119. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

120. Plaintiffs bring this claim individually and on behalf of the Class against Defendants.

121. Plaintiffs bring this claim in the alternative if the Court finds the information collected here by the Third Parties was not the "contents" of any communication. *See* Cal. Pen. Code § 638.50(b) ("'Pen register' means a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, *but not the contents of a communication*.") (emphasis added).

122. CIPA § 638.51(a) proscribes any "person" from "intall[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

123. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire of electronic communication is transmitted, but not the contents of a communication." Cal. Pen. Code § 638.50(b).

124. The Evergage SaaS and Snapchat Pixel are "pen registers" because they are "device[s] or process[es]" that "capture[d] the "routing, addressing, or signaling information"—users' e-mail addresses and IP addresses—from the electronic communications transmitted by

Plaintiffs' and the Class Member's computers. Cal. Pen. Code § 638.50(b); *see also Shah*, 754 F. Supp. 3d at 930.

125. At all relevant times, Defendants installed the Evergage SaaS and Snapchat Pixel on the Website, which enabled the Third Parties to receive Plaintiffs' and Class Member's e-mail addresses and IP addresses. Defendants then used the Evergage SaaS and Snapchat Pixel and the information collected by the Third Parties for marketing, advertising, and data analytics purposes.

126. Plaintiffs and the Class Members did not provide their prior consent to Defendants' installation or use of the Google Analytics and Evergage tracker.

127. Defendants did not obtain a court order to install or use the pen registers.

128. Pursuant to Cal. Pen. Code § 637.2, Plaintiffs and the Class Members have been injured by Defendants' violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendants' violations of CIPA § 638.51(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and behalf of all others similarly situated, seek judgment against Defendants, as follows:

(a) For an order certifying the Class pursuant to Fed. R. Civ. P. 23, naming Plaintiffs as the representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(b) For an order declaring that Defendants' conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d) For an award for statutory damages to the extent available;

(e) For pre- and post-judgment interest on all amounts awarded; and

(f) For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Dated: May 9, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: <u>*/s/ L. Timothy Fisher*</u>
L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
jglatt@bursor.com

*Attorneys for Plaintiffs*