**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
jglatt@bursor.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

EVAN WOOTEN and SARKIS OGANYAN, individually and on behalf all others similarly situated,

Plaintiffs,

v.

BIOLIFE PLASMA SERVICES L.P. and TAKEDA PHARMACEUTICALS U.S.A., INC.,

Defendants.

Case No. 1:25-cv-00099-KES-SKO

**OPPOSITION TO DEFENDANTS BIOLIFE PLASMA SERVICES L.P.'S AND TAKEDA PHARMACEUTICALS U.S.A., INC.'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Date: September 8, 2025
Time: 1:30 p.m.
Courtroom: 6, 7th Floor
Judge: Hon. Kirk E. Sherriff

**TABLE OF CONTENTS**

**PAGE**


INTRODUCTION ..... 1

ARGUMENT ..... 2

I. THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS ..... 2

A. Defendants Purposefully Directed Their Conduct At California ..... 2

B. Plaintiffs' Claims Are Related To Defendants' Conduct ..... 4

II. DEFENDANTS FAIL TO SHOW PLAINTIFFS ASSENTED TO DEFENDANTS' PRIVACY POLICY ..... 5

A. Defendants Have Not Shown That Plaintiffs Were On Notice Of The Hyperlinked Privacy Policy ..... 6

B. Defendants Have Not Shown That Plaintiffs Unambiguously Manifested Assent To The Privacy Policy ..... 8

III. PLAINTIFFS HAVE STATUTORY STANDING ..... 10

IV. PLAINTIFFS HAVE STATED A CLAIM FOR VIOLATION OF CIPA § 631 ..... 12

A. Plaintiffs Have Plausibly Alleged That Salesforce And Snap Read The Contents Of Plaintiffs' Communications In Transit ..... 12

B. Plaintiffs' E-Mail Addresses Were Communicated Within Defendants' Online Form And Are Thus "Contents" ..... 15

C. Defendants Aided, Agreed With, Employed, And Otherwise Enabled Snap And Salesforce To Wiretap Plaintiffs' Communications ..... 16

V. PLAINTIFFS HAVE STATED A CLAIM FOR VIOLATION OF CIPA § 638.51 ..... 18

A. CIPA § 638.51 Applies To Internet Tracking Technology ..... 18

B. The Trackers Recorded Or Decoded Information Transmitted From Plaintiffs' Computers, Per The Plain Text Of The Statute ..... 21

C. IP Addresses And E-Mail Addresses Are "Addressing" Information, Whose Collection By Third Parties Is Prohibited Without Consent ..... 21

VI. PLAINTIFF WOOTEN'S CLAIMS ARE TIMELY ..... 24

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Ambriz v. Google, LLC*,
2025 WL 830450 (N.D. Cal. Feb. 10, 2025) .......... 14

*Aviles v. Liveramp, Inc.*,
2025 WL 487196 (Cal. Super. Ct. Jan. 28, 2025) .......... 23

*Berman v. Freedom Fin. Network.*,
30 F. 4th 849 (9th Cir. 2022) .......... 6, 8, 9

*Bliss v. CoreCivic, Inc.*,
978 F. 3d 1144 (9th Cir. 2020) .......... 25

*Briskin v. Shopify, Inc.*,
135 F. 4th 739 (9th Cir. 2025) .......... 2, 3, 4

*Burzdak v. Universal Screen Arts, Inc.*,
2021 WL 3621830 (N.D. Cal. Aug. 16, 2021) .......... 8

*Byars v. Hot Topic, Inc.*,
656 F. Supp. 3d 1051 (C.D. Cal. 2023) .......... 23

*Calhoun v. Google, LLC*,
113 F. 4th 1141 (9th Cir. 2024) .......... 5

*Casillas v. Transitions Optical, Inc.*,
2024 WL 487370 (Cal. Super. Ct. Sept. 9, 2024) .......... 23

*Choballa v. ClassPass Inc.*,
129 F. 4th 1147 (9th Cir. 2025) .......... 9

*Conohan v. Rad Power Bikes Inc.*,
2025 WL 1111246 (C.D. Cal. Apr. 3, 2025) .......... 22

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) .......... 19

*Cousin v. Sharp Healthcare*,
681 F. Supp. 3d 1117 (S.D. Cal. 2023) .......... 17

*Doe v. Call-On DOC, Inc.*,
2025 WL 1677632 (S.D. Cal. June 13, 2025) .......... 3

*Doe v. Tenet Healthcare Corp.*,
2025 WL 1635956 (E.D. Cal. June 9, 2025) .......... 17

*Dohrmann v. Intuit, Inc.*,
823 F. App'x 482 (9th Cir. 2020) ..... 9

*E.H. v. Meta Platforms, Inc.*,
2024 WL 557728 (N.D. Cal. Feb. 12, 2024) ..... 11

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ..... 11

*Esparza v. UAG Escondido AI Inc.*,
2024 WL 559241 (S.D. Cal. Feb. 12, 2024) ..... 17

*Flanagan v. Flanagan*,
27 Cal. 4th 766 (2002) ..... 20

*Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*,
592 U.S. 351 (2021) ..... 5

*Fox v. Ethicon Endo-Surgery, Inc.*,
35 Cal. 4th 797 (2005) ..... 24

*Franklin v. Ocwen Loan Serv., LLC*,
2018 WL 5923450 (N.D. Cal. Nov. 13, 2018) ..... 25

*Frasco v. Flo Health, Inc.*,
2025 WL 1433825 (N.D. Cal. May 19, 2025) ..... 10

*Gaige v. Exer Holding Co., LLC*,
2025 WL 559719 (C.D. Cal. Mar. 2, 2025) ..... 24

*Gladstone v. Amazon Web Servs.*,
739 F. Supp. 3d 846 (W.D. Wash. 2024) ..... 20

*Godun v. JustAnswer LLC*,
135 F. 4th 699 (9th Cir. 2025) ..... 6, 8, 9

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) ..... 19, 23

*Hasson v. FullStory, Inc.*,
114 F. 4th 181 (3rd Cir. 2024) ..... 3

*Heiting v. FKA Distributing Co.*,
2025 WL 736594 (C.D. Cal. May 15, 2025) ..... 19

*Herzog. v. Super. Ct.*,
101 Cal. App. 5th 1280 (2024) ..... 7

*Hidalgo v. JPMorgan Chase Bank, N.A.*,
2025 WL 1370488 (S.D. Cal. May 12, 2025) ..... 4

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ........ 1, 10

*In re Meta Pixel Tax Filing Cases*,
724 F. Supp. 3d 987 (N.D. Cal. 2024) ........ 12

*In re Pharmatrak*,
329 F. 3d 9 (1st Cir. 2003) ........ 15

*In re Zynga Priv. Litig.*,
750 F. 3d 1098 (9th Cir. 2014) ........ 15

*James v. Walt Disney Co.*,
701 F. Supp. 3d 942 (N.D. Cal. 2023) ........ 12

*Javier v. Assurance IQ, LLC*,
649 F. Supp. 3d 891 (N.D. Cal. 2023) ........ 24, 25

*Javier v. Assurance IQ, LLC*,
2022 WL 1744107 (9th Cir. 2022) ........ 20

*Jones v. Ford Motor Co.*,
85 F. 4th 570 (9th Cir. 2023) ........ 10

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) ........ 16

*Kishore v. Times Internet (UK) Ltd.*,
2024 WL 4197619 (N.D. Cal. Sept. 12, 2024) ........ 14

*Lee v. Plex, Inc.*,
773 F. Supp. 3d 755 (N.D. Cal. 2025) ........ 9

*Lesh v. Cable News Network, Inc.*,
767 F. Supp. 3d 33 (S.D.N.Y. 2025) ........ passim

*Licea v. Hickory Farms LLC*,
2024 WL 1698147 (Cal. Super. Ct. Mar. 13, 2024) ........ 23

*Lineberry v. AddShopper, Inc.*,
2025 WL 551864 (N.D. Cal. Feb. 19, 2025) ........ 10, 16

*Maddalena v. Tootle*,
2013 WL 5491869 (C.D. Cal. Oct. 1, 2013) ........ 25

*Matera v. Google Inc.*,
2016 WL 8200619 (N.D. Cal. Aug. 12, 2016) ........ 19

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
647 F. 3d 1218 (9th Cir. 2011) ........ 3

*Mirmalek v. Los Angeles Times Commc'ns LLC*,
2024 WL 5102709 (N.D. Cal. Dec. 12, 2024) ........................................................ 19, 21, 22

*Moody v. C2 Educational Sys. Inc.*,
742 F. Supp. 3d 1072 (C.D. Cal. 2024)................................................................. 19, 20, 21

*Morrison v. Yippee Ent., Inc.*,
756 F. Supp. 3d 842 (S.D. Cal. 2024) ...................................................................... 6, 7

*Motely v. ContextLogic, Inc.*,
2018 WL 5906079 (N.D. Cal. Nov. 9, 2018) ............................................................. 8

*Price v. Carnival Corp.*,
712 F. Supp. 3d 1347 (S.D. Cal. 2024) ............................................................ 11, 15, 16

*Quamina v. JustAnswer LLC*,
721 F. Supp. 3d 1026 (N.D. Cal. 2024)........................................................................ 9

*R.C. v. Sussex Publishers, LLC*,
2025 WL 948060 (N.D. Cal. Mar. 28, 2025) ............................................................ 12

*Revitch v. New Moosejaw, LLC*,
2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) ........................................................... 17

*Ribas v. Clark*,
38 Cal. 3d 355 (1985)............................................................................................ 1, 10

*Rodriguez v. Autotrader.com, Inc.*,
762 F. Supp. 3d 921 (C.D. Cal. 2025)...................................................................... 19, 22

*Rodriguez v. Plivo Inc.*,
2024 WL 514413 (Cal. Super. Ct. Oct. 2, 2024)........................................................ 23

*Roney v. Miller*,
705 F. App'x 670 (9th Cir. 2017)............................................................................. 25

*Rosenthal v. Bloomingdales.com, LLC*,
101 F. 4th 90 (1st Cir. 2024) ....................................................................................... 3

*Sadlock v. Walt Disney Co.*,
2023 WL 4869245 (N.D. Cal. July 31, 2023) .............................................................. 7

*Saleh v. Nike, Inc.*,
562 F. Supp. 3d 503 (C.D. Cal. 2021)....................................................................... 15

*Seneca v. Homeaglow Inc.*,
2024 WL 750029 (C.D. Cal. Feb. 7, 2024) ............................................................... 6, 7

*Serrano v. Open Road Delivery Holdings, Inc.*,
666 F. Supp. 3d 1089 (C.D. Cal. 2023)........................................................................ 8

*Sgouros v. TransUnion Corp.*,
817 F.3d 1029 (7th Cir. 2016) .......... 24

*Shah v. Fandom, Inc.*,
754 F. Supp. 3d 925 (N.D. Cal. 2024) .......... passim

*St. Aubin v. Carbon Health Techs., Inc.*,
2024 WL 4369675 (N.D. Cal. Oct. 1, 2024) .......... 17, 18

*Swift v. Zynga Games Network, Inc.*,
805 F. Supp. 2d 904 (N.D. Cal. 2011) .......... 10

*Tanner v. Acushnet Co.*,
2023 WL 8152104 (C.D. Cal. Nov. 20, 2023) .......... 15

*Tate v. VITAS Healthcare Corp.*,
762 F. Supp. 3d 949 (E.D. Cal. Jan. 8, 2025) .......... 16

*TBG Ins. Serv. Corp. v. Super. Ct.*,
96 Cal. App. 4th 443 (2002) .......... 24

*Tejon v. Zeus Networks, LLC*,
725 F. Supp. 3d 1351 (S.D. Fla. 2024) .......... 7

*Thomas v. Papa Johns Int'l, Inc.*,
2023 WL 6370641 (S.D. Cal. Aug. 14, 2023) .......... 3, 5

*Thomas v. Papa John's Int'l., Inc.*,
2025 WL 1704437 (9th Cir. June 18, 2025) .......... 2, 3, 4

*Torres v. Prudential Fin., Inc.*,
2025 WL 1135088 (N.D. Cal. Apr. 17, 2025) .......... 14

*U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*,
720 F. 3d 1174 (9th Cir. 2013) .......... 24

*United States v. Forrester*,
512 F.3d 500 (9th Cir. 2008) .......... 22

*United States v. Hastie*,
854 F.3d 1298 (11th Cir. 2017) .......... 11

*Yockey v. Salesforce, Inc.*,
688 F. Supp. 3d 962 (N.D. Cal. 2023) .......... 14

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) .......... 9

*Zarif v. Hwareh.com, Inc.*,
2025 WL 486317 (S.D. Cal. Feb. 13, 2025) .......... 19

**STATUTES**

Cal. Civ. Code § 1798.140(v)(1)(A) ..... 11

Cal. Penal Code § 631 ..... 16, 17, 18

Cal. Penal Code § 631(a) ..... 16, 17, 20

Cal. Penal Code § 637.2 ..... 12, 13

Cal. Penal Code § 638.50 ..... 20, 21

Cal. Penal Code § 638.50(b) ..... 20, 21

Cal. Penal Code § 638.52 ..... 20

**RULES**

Fed. R. Civ. P. 8(d)(3) ..... 16

## INTRODUCTION

Despite conducting significant business in California, Defendants seek to avoid the ramifications of their harms caused to Californians in violation of California privacy laws. Specifically, Defendants "operate 20 plasma donation centers in California, including eight in this District alone." FAC ¶ 14. To schedule plasma donation appointments at any of these centers, users must visit Defendants' Website and create an account.[1] *Id.* ¶¶ 14, 33. And *before* users even finish creating their account or ostensibly agree to any sort of privacy policy, Defendants enable two third parties—Snap and Salesforce—to collect Plaintiffs' and other Website users' personal information: their e-mail addresses and IP addresses. *Id.* ¶ 42. This information is then used by Snap and Salesforce to facilitate targeted advertising and marketing, as well as for Snap and Salesforce's own benefits. *Id.* ¶¶ 82, 86-90, 92-100. And by allowing these third parties to collect both Plaintiffs' and Website users' e-mail addresses and IP addresses, Defendants enable the third parties to bridge Plaintiffs' and Website users' identities and track them across multiple websites. *Id.* ¶¶ 73-80.

To put this simply, Defendants' conduct violated the basic privacy principle behind the CIPA: "the right to control the nature and extent of the firsthand dissemination of [one's] statements." *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (cleaned up); *see also In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 598 (9th Cir. 2020) (finding the CIPA codifies "a substantive right to privacy," namely "the individual's control of information concerning his or her person") (cleaned up); Article 29 Data Protection Working Party, *Opinion 15/2011 On The Definition Of Consent*, at 9 (July 13, 2011) ("Obtaining consent before the processing of data starts is an essential condition to legitimi[z]e the processing of data.").

Against these principles, Defendants seek to avoid jurisdiction and re-write the CIPA, but its arguments have been routinely rejected by both the Ninth Circuit and California district courts. For the following reasons, Defendants' Motion should be denied in its entirety.

---

[1] All capitalized terms not otherwise defined herein shall be given the same meaning as in the FAC.

## ARGUMENT

### I. THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS

Defendants argue that this Court lacks personal jurisdiction over it because (1) Plaintiffs failed to "establish" that Defendants expressly aimed their conduct at California and (2) Plaintiffs failed to plead any facts "establishing that their claims arise out of or relate to any of BioLife's alleged contacts with California." MTD at 5-6. Defendants are wrong on both fronts. Courts in this circuit analyze specific personal jurisdiction under a three-part test: (1) whether the defendant[s] "purposefully direct[ed their] activities or consummate some transaction with the forum or resident thereof … thereby invoking the benefits and protections of its laws;" (2) whether the claim is one which arises out of or relates to the defendant's forum-related activities; and (3) whether the exercise of jurisdiction comports with fair play and substantial justice such that it is reasonable. *Briskin v. Shopify, Inc.*, 135 F. 4th 739, 750-51 (9th Cir. 2025). Defendants do not argue that exercising personal jurisdiction would be unreasonable.

#### A. Defendants Purposefully Directed Their Conduct At California

Defendants argue that "Plaintiffs fail to establish that BioLife 'expressly aimed' any tortious conduct at California," MTD at 5, because "Plaintiffs do not—and cannot—allege that this alleged conduct was targeted at California because Plaintiffs do not allege that BioLife knew that they were 'in California' *before* these tools allegedly collected their email and IP addresses." *Id.* at 6 (emphasis in original). Defendants misstate the law and ignore Plaintiffs' allegations.

Two cases entirely dispose of Defendants' argument. *First*, in *Briskin*, 135 F.4th at 747, when the plaintiff "viewed one of the items he later purchased, Shopify installed tracking cookies onto his device, enabling it to track Briskin's behavior … including geolocation data … [and] the IP address." In finding that the plaintiff had made a showing of jurisdiction over the defendant, the Ninth Circuit explained that "Shopify allegedly knew the location of consumers like Briskin either prior to or shortly after installing its initial tracking software onto their devices," and thus, "Shopify's intentional activities constitute express aiming toward California." *Id.* at 756.

*Second*, in *Thomas v. Papa John's Int'l., Inc.*, 2025 WL 1704437, at *1 (9th Cir. June 18, 2025), the Ninth Circuit found purposeful direction satisfied because "Papa John's uses its website

to intentionally collect information that invades the privacy of users, knowing that any alleged harm will be suffered in California." Likewise, the district court in *Thomas* found jurisdiction was proper because the defendant's website was integrated with its "130 stores in California." *Thomas v. Papa Johns Int'l, Inc.*, 2023 WL 6370641, at *5-6 (S.D. Cal. Aug. 14, 2023), *aff'd*, 2025 WL 1704437 (9th Cir. June 18, 2025) (cleaned up).

Applying *Briskin* and *Thomas* here, Plaintiffs plausibly allege Defendants purposefully directed their conduct at California. Like in *Briskin*, Defendants knew consumers were accessing the Website from California when Defendants installed the Trackers because Defendants would have separately received consumers' IP addresses when they first accessed the Website. *See* FAC ¶¶ 36-37 ("To make Defendants' Websites load on a user's internet browser, the browser sends an 'HTTP request' … to Defendants' server … In response … Defendants' server sends an 'HTTP response' back to the browser with a set of instructions. … [T]he server's instructions cause the trackers to be installed on a user's browser. The trackers then cause the browser to send identifying information to the Third Parties as the user's communications with the Website."). The IP address reveals the approximate location of the user, *id.* ¶¶ 61-62, and thus, Defendants would know users are visiting the Website from California. *See Doe v. Call-On DOC, Inc.*, 2025 WL 1677632, at *8 (S.D. Cal. June 13, 2025) (finding personal jurisdiction over the defendant where it "knowingly and intentionally embedded and configured Google Analytics and TikTok Pixel on its website and expressly aimed its conduct at California by assisting them in the targeting of Plaintiff's device for its own personal gain"). In addition, "Defendants operate 20 plasma donation centers in California, including eight in this District alone." *Id.* ¶ 14. Defendants thus "appeal[] to, and profit[] from" Californians, and thus "can be said to have 'expressly aimed' at [California]." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F. 3d 1218, 1231 (9th Cir. 2011).

Defendants' citations to out-of-circuit authorities that predate (and contradict) *Briskin* and *Thomas* do not, and cannot, bind this Court. MTD at 6:4-11 (citing *Hasson v. FullStory, Inc.*, 114 F. 4th 181 (3rd Cir. 2024); *Rosenthal v. Bloomingdales.com, LLC*, 101 F. 4th 90, 97 (1st Cir. 2024)). And Defendants' argument that they did not know they were invading Californians' privacy rings hollow in light of the above, which perfectly brings this case within *Briskin*'s realm. Indeed, this

case is even stronger than *Briskin* on jurisdiction. In *Briskin*, the Court found a third party service provider was subject to jurisdiction in California where it knowingly collected data from websites its technology was installed on. *Briskin* 135 F. 4th at 759-60. Thus, the third party had no control over whose data it collected. But here, Defendants operate their Website *and* they clearly contemplate California visitors, as Defendants have set up two dozen donation centers in this state. FAC ¶ 32; *see also Thomas*, 2025 WL 1704437, at *1. So, Defendants are knowingly catering to California donors, expecting those Californians to visit their Website, and then knowingly inflicting privacy harms on Californians. That suffices.

Regardless, "[t]he Ninth Circuit has consistently held that a defendant's intentional actions targeting a known California resident *or* profiting from California's market constitute 'express aiming.'" *Hidalgo v. JPMorgan Chase Bank, N.A.*, 2025 WL 1370488, at *3 (S.D. Cal. May 12, 2025) (emphasis added). And the *Briskin* court explained that it did "not agree that the effect on *Briskin* is mere happenstance because Shopify allegedly knew the location of consumers like Briskin *either* prior to *or shortly after* installing its initial tracking software on their devices." *Briskin*, 135 F. 4th at 756 (emphasis added). Therefore, Plaintiffs have established purposeful direction.

**B. Plaintiffs' Claims Are Related To Defendants' Conduct**

Defendants argue that "Plaintiffs also fail to plead facts establishing that their claims arise out of or relate to any of BioLife's alleged contacts with California." MTD at 6:25-26. Defendants are wrong. As an initial matter, the conduct at issue here is the same as one of Defendants' connections with California: their knowing infliction of privacy harms on Californians by enabling third party surveillance. FAC ¶¶ 36-37. Plaintiffs' claims clearly arise out of these connections. *Briskin*, 135 F. 4th at 760 (finding relation where "Shopify's installation of software onto unsuspecting Californians' devices and extracting personal data from them is the kind of contact that would tend to cause privacy injuries.").

Moreover, Plaintiffs' claims also relate to Defendants' two dozen donation centers in California. The purpose of Defendants' Website is to enable prospective donors to create an account so that they can book donation appointments. *See* FAC ¶ 14. Indeed, "[a] prospective donor cannot donate until they have made a BioLife account." "To make the account, the prospective donor can

sign up on Defendants' Website." *Id.* ¶ 33. During this account creation process, Defendants enable third parties to collect consumers' personal information. *Id.* ¶¶ 41-42. Defendants' argument thus "fails to acknowledge what is presumably the primary reason why Plaintiff[s] and other California residents access Defendant[s'] website in the first place," and "[a]lthough Defendant[s] attempt[] to segregate its use of … technology from its California-based activities, there is no evidence to support such a bright-line distinction." *Thomas*, 2023 WL 6370641, at *5; *see also*, *e.g.*, *Conohan v. Rad Power Bikes Inc.*, 2025 WL 11111246, at *4 (C.D. Cal. Apr. 3, 2025) (finding "Conohan's claim both arises out of and relates to Rad's contacts with California" where "Conohan would not have sustained his alleged injury had not Rad made its products available to California residents, such as Plaintiff, through its Website"); *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 592 U.S. 351, 352 (2021); ("[T]his Court has stated that specific jurisdiction attaches in cases identical to this one—when a company cultivates a market for a product in the forum State and the product malfunctions there."). Accordingly, relation is satisfied.

## II. DEFENDANTS FAIL TO SHOW PLAINTIFFS ASSENTED TO DEFENDANTS' PRIVACY POLICY

Defendants argue that "Plaintiffs agreed to BioLife's alleged data collection practices *before* their email and IP addresses were purportedly collected when creating their BioLife accounts." MTD at 7:19-20 (emphasis in original). But Defendants "bear the burden to establish consent and, on a motion to dismiss, would be required to show that the allegations of the complaint established consent as a matter of law." *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 925, 931 (N.D. Cal. 2024); *Calhoun v. Google, LLC*, 113 F. 4th 1141, 1147 (9th Cir. 2024) ("[C]onsent is an affirmative defense for which defendant bears the burden of proof.") (cleaned up). Defendants fail to meet their burden.

At issue here is whether Plaintiffs had notice of and assented to "BioLife's alleged data collection practices" on the below screen. MTD at 7:19-20:

//

//

//

//




FAC ¶ 41. "Under an inquiry theory of notice, contracts are formed between website users and operators only where (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Godun v. JustAnswer LLC*, 135 F. 4th 699, 709 (9th Cir. 2025) (cleaned up). Neither is met.

**A. Defendants Have Not Shown That Plaintiffs Were On Notice Of The Hyperlinked Privacy Policy**

"Courts employ a variety of criteria by which they assess whether a website provides reasonably conspicuous notice of terms, including hyperlink font size, color, prominence within the webpage, obviousness, and other indicators that 'ensure that [the hyperlink] is sufficiently "set apart" from the surrounding text.'" *Morrison v. Yippee Ent., Inc.*, 756 F. Supp. 3d 842, 849 (S.D. Cal. 2024) (quoting *Berman v. Freedom Fin. Network.*, 30 F. 4th 849, 856-58 (9th Cir. 2022)). Considering these factors here, Defendant cannot show that the hyperlink was clearly and conspicuously presented.

*First*, courts have found that where the hyperlinked term is included in a block of text, the link is not conspicuous. For instance, in *Seneca v. Homeaglow Inc.*, 2024 WL 750029, at *4 (C.D. Cal. Feb. 7, 2024), *aff'd*, 2025 WL 852896 (9th Cir. Mar. 19, 2025), the court found there was no notice of a hyperlink where it was contained "in the body of [a] paragraph" whose "only conditions … address[ed] consent to contact from Homeaglow and the selected cleaner regarding the customer's booking." The hyperlink in *Seneca* appeared as follows:




*Seneca v. Homeaglow Inc.*, Case No. 8:23-cv-2308, ECF No. 11-6 (C.D. Cal. Jan. 12, 2024); *see also* *Sadlock v. Walt Disney Co.*, 2023 WL 4869245, at *10 (N.D. Cal. July 31, 2023) (denying motion to compel arbitration where "[t]he hyperlink to the 'Subscriber Agreement' is buried in six lines of text and is located five lines aware from the 'Agree and Subscribe' button."); *Morrison*, 756 F. Supp. 3d at 850 (same where "though located near the 'Start Subscription' button, [the hyperlinked Terms of Service was] within an eight-line paragraph, all in font smaller than that on the page generally"). Here too, Defendants' hyperlink is located in a multi-line paragraph.

*Second*, the link to the Privacy Policy is included in a sentence informing Plaintiffs that their information will be used for "the donation process" (exactly what they were making their accounts for). As in *Seneca*, these extraneous conditions "suggest to a user that once they subscribe and read the language underneath the subscription buttons, the user has considered all relevant conditions to the subscription, and the subscription process is over." *Tejon v. Zeus Networks, LLC*, 725 F. Supp. 3d 1351, 1357 (S.D. Fla. 2024); *Herzog. v. Super. Ct.*, 101 Cal. App. 5th 1280, 1298 (2024) ("A user would have no reason to believe, given … the content of the text … that by clicking the checkbox next to 'I agree to Terms of Use' they were entering an agreement that concerned any matters other than the scope of the user's privacy waiver and management of the user's personal information.");

*Burzdak v. Universal Screen Arts, Inc.*, 2021 WL 3621830, at *6 (N.D. Cal. Aug. 16, 2021) ("Although there is, in the instant case, some visual proximity between the Terms of Use and the relevant button … the value of the visual proximity is reduced by the fact that the reference to the Terms of Use is buried in a relatively lengthy paragraph that largely focuses on and promotes free shipping and the VIP Insider program. This stands in contrast to [previous decisions] where the Terms of Use are referred to in a short, simple sentence."); *Motely v. ContextLogic, Inc.*, 2018 WL 5906079, at *2 (N.D. Cal. Nov. 9, 2018) (declining to find mutual assent where the hyperlinked word "'used in connection with the "more details" language that is most readily understood as referring to possible message and data charges … and not to the terms of service.'").

*Finally*, the hyperlink is in the smallest font on the page. *See Berman*, 30 F.4th at 856-57 (no notice where hyperlink is "considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye"); *Serrano v. Open Road Delivery Holdings, Inc.*, 666 F. Supp. 3d 1089, 1096 (C.D. Cal. 2023) (denying motion to compel arbitration where "the page contained four fillable fields for the user to input" and "the notice language at the bottom of the page is still the least conspicuous part of the webpage, and nothing in the webpage draws the viewer's attention to it"). Based on these factors, Defendants have not met their burden to show that the hyperlinked terms were conspicuously presented to Plaintiffs.

**B. Defendants Have Not Shown That Plaintiffs Unambiguously Manifested Assent To The Privacy Policy**

Even if Defendants demonstrated Plaintiffs were on notice of the Privacy Policy (and they have not), Defendants have not demonstrated that Plaintiffs assented to it. "Following California caselaw, [courts] have held that such unambiguous manifestation of assent can only occur in the inquiry-notice context when an internet user is '*explicitly* advised that the act of clicking will constitute assent to the terms and conditions of an agreement.'" *Godun*, 135 F. 4th at 710-11 (emphasis in original) (quoting *Berman*, 30 F. 4th at 857). Defendants' page never does this.

Here, the page states that,

> [b]y providing my contact information, I agree that the information I provided may be used in the donation process. *For more information* on how BioLife processes my personal information *I can go to* the BioLife Privacy Notice.

FAC ¶ 41 (emphasis added). This disclaimer merely invites the user to view the Privacy Policy. It does *not* ask the user to agree to it in any manner. *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1078, 1080 (C.D. Cal. 2021) (finding no consent to privacy policy where disclaimer language stated that user "could 'learn more' about the Privacy Policy"); *see also Quamina v. JustAnswer LLC*, 721 F. Supp. 3d 1026, 1039 (N.D. Cal. 2024) ("[T]he email provides no such notice. A reasonably prudent user would believe that licking 'Learn more' would pull up information about how to cancel her membership – not about purportedly binding terms of service."). And, "[r]easonable conspicuousness alone is not sufficient to bind a user—a user must agree to the terms, not merely see them." *Choballa v. ClassPass Inc.*, 129 F. 4th 1147, 1158 (9th Cir. 2025)).

Defendants argue that "[b]y affirmatively clicking the 'Next' button … Plaintiffs physically manifested their consent to BioLife's alleged data collection practices." MTD at 8:15-17. Defendants are wrong. The disclaimer language does not state that "By clicking 'Next,' you agree to the Privacy Policy." And absent that specific linkage, Ninth Circuit law is clear that there is no manifestation of assent. *See Godun*, 135 F. 4th at 712-13 ("The advisal lacked an explanatory phrase indicating that 'By clicking connect now' … she agreed to the terms. Like the faulty advisals in *Berman* and *Chabolla*, it instead simply said 'I agree' without explaining more."); *Berman*, 30 F. 4th at 858 (finding no assent where "[b]oth webpages stated, 'I understand and agree to the Terms & Conditions,' but they did not indicate to the user what action would constitute assent to those terms and conditions"); *Lee v. Plex, Inc.*, 773 F. Supp. 3d 755, 767 (N.D. Cal. 2025) (same where "[t]he notice language … states: 'By creating an account or continuing to use a Plex application, website, or software, you acknowledge and agree that you have accepted the Terms of Service and Privacy Policy.' In context, this language is ambiguous because it describes two actions that constitute assent, but neither matches the 'Continue with Facebook' button that Plaintiff clicked").

Defendants' authorities—all of which pre-date *Godun* and most of which predate *Chabolla*—are inapposite. In each of Defendants' cases, unlike here, there was explicit language clarifying that clicking the button manifested assent to the terms. *See Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 484 (9th Cir. 2020) ("[A] user accessing a TurboTax account … was required to click a 'Sign In' button … which the following language appeared: '*By clicking Sign In, you agree to the Turbo Terms*

*of Use, TurboTax Terms of Use, and have read and acknowledge our Privacy Statement*.'") (emphasis in original); *Swift v. Zynga Games Network, Inc.* 805 F. Supp. 2d 904, 911 (N.D. Cal. 2011) (finding assent where "[p]laintiff admits that she was required to and did click on an 'Accept' button directly above a statement that clicking on the button served as assent to the YoVille terms of service along with a blue hyperlink directly to the terms of service."). Thus, Defendants cannot show that Plaintiffs assented to the Privacy Policy *before* their information was collected by third parties. And without assent to the Privacy Policy, there can be no consent to Defendants' conduct.

**III. PLAINTIFFS HAVE STATUTORY STANDING**

Defendants argue that Plaintiffs lack statutory standing because "they fail to allege any such concrete injury" as the collection of their e-mail and IP addresses are "not 'personal information' … because the data 'in itself provides no information about the user.'" MTD at 9: 16-17. Not so. As an initial matter, "[t]he question whether an invasion of privacy is severe enough to confer liability is distinct from whether the injury is concrete and particularized enough to confer standing in federal court." *Lineberry v. AddShopper, Inc.*, 2025 WL 551864, at *1 (N.D. Cal. Feb. 19, 2025). Thus, Defendants' invocation of a "concrete injury" standard is improper.

Regardless, as the California Supreme Court has explained, the purpose of wiretapping statutes like the CIPA is to protect the right of an individual "to control the nature and extent of the firsthand dissemination of" one's information. *See Ribas*, 38 Cal. 3d at 360-61; *In re Facebook, Inc. Internet Tracking Litig.*, 956 F. 3d at 598 (noting that CIPA codified the right to privacy in "the individual's control of information concerning his or her person"); *Jones v. Ford Motor Co.*, 85 F. 4th 570, 574 (9th Cir. 2023) ("A statute that codifies a common law privacy right gives rise to a concrete injury sufficient to confer standing.") (cleaned up). As discussed below, this includes the e-mail addresses transmitted to the Third Parties. *See* Argument § IV, B, *infra*. Consequently, "obtaining user information" "is the 'concrete harm,'" as the user "has lost control over her private information because of another's intentional actions." *Frasco v. Flo Health, Inc.*, ---F.R.D.----, 2025 WL 1433825, at *12 (N.D. Cal. May 19, 2025).

Here, Plaintiffs' information was collected by third parties before Plaintiffs even had the opportunity to consent. FAC ¶¶ 6-9, 42. That information was then compiled into profiles and used

for marketing and advertising purposes. *Id.* ¶¶ 86-91; 95-101. Plaintiffs were thus harmed because they lost the right to control who does and does not get to know personal information about them. *Price v. Carnival Corp.*, 712 F. Supp. 3d 1347, 1354 (S.D. Cal. 2024) (finding standing where "Plaintiffs' personal information, including their … email address," was intercepted by third parties).

Moreover, Defendants are wrong that e-mail addresses and IP addresses are not "personal information." As to e-mail addresses, "industry leaders, trade groups, and courts agree[] an ordinary person can use an email address to uniquely identify another individual." FAC ¶ 46; *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017) ("[A]n email address may very well readily enable an 'ordinary person' to identify an individual."); *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual."). Indeed, Defendants themselves define an "email" as "personal information." *See* Szatkowski Decl. Ex. A at 1. The alleged "hashing" of the e-mail addresses is irrelevant as the FTC has noted. FAC ¶¶ 53-54. Thus, the unauthorized collection of e-mail addresses by third parties constitutes statutory harm. *See Price*, 712 F. Supp. 3d at 1354; *see also E.H. v. Meta Platforms, Inc.*, 2024 WL 557728, at *3 (N.D. Cal. Feb. 12, 2024) ("Meta provides no caselaw regarding disclosure of personally identifying information from individuals seeking mental health services or other caselaw that would preclude this type of invasion of privacy claim as a matter of law at the motion to dismiss stage.").

As to an "Internet Protocol address," the California Legislature considers this information to be "personal information" because it is "reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civ. Code § 1798.140(v)(1)(A). This is particularly so where, as here, the user's IP address is collected alongside their e-mail address. This enables ID Bridging—whether through "Probabilistic Matching," which leans more on a user's IP address, or Deterministic Matching, which leans on e-mail addresses—to pair aggregated data about a consumer to the consumer's identity so "advertisers [can] find users that are more directly and likely interested in what is being sold by having access to significantly more information." FAC ¶¶ 76-79. And it is for this reason that, "[i]n determining statutory standing under CIPA, courts have held IP address collection for targeted advertisement

creates a concrete injury-in-fact." *R.C. v. Sussex Publishers, LLC*, 2025 WL 948060, at *3 (N.D. Cal. Mar. 28, 2025); *see also Shah,* 754 F. Supp. 3d at 932 (finding statutory standing under CIPA based on IP address collection where IP addresses were collected and used by third parties to "track[] [consumers] across multiple visits for marketing and advertising purposes, and that [consumers] did not expect or agree to such tracking"); *see also Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33, 39-40 (S.D.N.Y. 2025) (same).

Defendants respond that the "only purported CIPA violations are predicated on the alleged interception of the data itself, not any subsequent uses of that data." MTD at 10:1-2. This seeks to create an artificial and unsupportable line between the installation of the Trackers by Defendants and harms stemming from it. Plaintiffs allege that Defendants enabled Snap and Salesforce to collect Plaintiffs' personal information without consent, and that Snap and Salesforce used that information for marketing and advertising purposes for Defendants' financial gain (and lost control of their information in the process). FAC ¶¶ 79, 125. Plaintiffs' injuries and the Third Parties' usage of Plaintiffs' information is thus directly traceable to, and caused by, Defendants' conduct (*e.g.*, installing the Trackers on their Website) and is part-and-parcel of Plaintiffs' injury. *See Shah*, 754 F. Supp. 3d at 931 ("Even if third parties developed and used the Tracker software, it is alleged that Fandom was responsible for integrating the third-party script into its own website.") (cleaned up); *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 954 (N.D. Cal. 2023) ("[O]ne can infer Disney intended to have Oracle intercept because Disney entered into a contract with Oracle so that Oracle would provide such services."); *cf. In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1009 (N.D. Cal. 2024) (finding "[t]he better interpretation" of Cal. Pen. Code § 637.2, as applied to a CIPA § 635, "is that injuries caused by use of an eavesdropping device are traceable to the manufacture, sale, and provision of that device, and that an injured party therefore has a private right of action against the creator of the device").

## IV. PLAINTIFFS HAVE STATED A CLAIM FOR VIOLATION OF CIPA § 631

### A. Plaintiffs Have Plausibly Alleged That Salesforce And Snap Read The Contents Of Plaintiffs' Communications In Transit

Defendants argue that Plaintiffs "do not plausibly allege that Salesforce or Snap 'read or attempt to read' their email … addresses 'in transit.'" MTD at 11:10-11. This is so, Defendants

posit, because "Salesforce and Snap could not possibly have read or attempted to read Plaintiffs' email addresses while in transit, because their email addresses were 'encrypted while in transit.'" *Id.* Plaintiffs make two key allegations, one of which Defendants ignore entirely, and the other of which raises a factual question inappropriate for resolution at this stage.

*First*, concerning Salesforce, Plaintiffs allege that "[t]o operate, a website like Defendants' will install a 'JavaScript icon [] [that] tracks the online behavior of [] web users. When a user accessed [the client's] website, the JavaScript icon places a first-party cookie on the user's browser, which sends data from that user back to Personalization.'" FAC ¶ 84. "Critically, built into JavaScript are the functions 'btoa' and 'atob.' 'btoa' … is the built-in function that encodes data in Base64. The inverse, 'btoa' is the built-in function that decodes Base64 data. 'These two functions are built into JavaScript and all modern browsers [like Plaintiffs'] support them.'" *Id.* ¶ 85.

These allegations, taken as true, permit a plausible inference that Plaintiffs' e-mail addresses are no longer encoded in Base64 while in transit through the Javascript functions that automatically decode them on the way to Salesforce. Defendants never address why these allegations foreclose a plausible inference that the e-mail addresses are not decoded from Base64 while in transit. Thus, Plaintiffs have plausibly alleged that Salesforce "read" or understood Plaintiffs' e-mail addresses in plain text while the e-mail addresses were "in transit."

*Second*, as to Snap, Plaintiffs allege that:

> Snap receives the non-hashed e-mail address in the first instance before hashing it through a process it calls "Automated Matching." Through "Automated Matching," Snap will automatically attempt to detect and send Snap information about customers such as information from forms on websites like Defendants' account creation forms. At this point, Snap hashes information it believes to be emails or phone numbers before they're sent to Snap in order to help protect users.

*Id.* ¶ 97.

"In other words, Snap necessarily reads and learns (or attempts to) the contents before receiving them but after being provided with them (*i.e.*, in transit from Defendants' Website to Snapchat) to determine if the communication is an e-mail that must be hashed." *Id.* ¶ 98. Indeed, how could Snap know that something was an e-mail address (and thus, hash it in-transit) without

reading the content of the communication in the first place? Accordingly, Snap is attempting to "understand[] the substantive meaning of the message, report or communication." *Torres v. Prudential Fin., Inc.*, 2025 WL 1135088, at *5 (N.D. Cal. Apr. 17, 2025).

Defendants argue that for Snap to encode e-mails in this manner, this matching function must be turned on. MTD at 12:1-2. As an initial matter, Plaintiffs do allege the matching function was turned on. Plaintiffs' dynamic analysis found that Snap was collecting e-mails in hashed form, giving rise to the plausible inference that Snap is looking to see whether the content is appropriate for hashing and then doing so. FAC ¶ 42. And Plaintiffs allege this functionality is employed on Defendants' Website. *Id.* ¶ 97. To the extent Defendants contend these functionalities were not toggled on, this is a question of fact inappropriate for resolution at this stage. *Kishore v. Times Internet (UK) Ltd.*, 2024 WL 4197619, at *2 (N.D. Cal. Sept. 12, 2024) ("Plaintiffs do not yet have access to specific information about how … Defendant used the Pixel. The Court declines the invitation to decide a factual dispute at the heart of Plaintiffs' case…"). Holding otherwise would require Plaintiffs to take discovery on Defendants' contracts with Third Parties prior to filing suit, which is, of course, not possible. Defendants' reliance on *Torres* is also misguided because *Torres* was decided on summary judgment, after fact discovery had occurred. *Torres*, 2025 WL 1135088, at *7.

*Finally*, Defendants confusingly attempt to draw a distinction between "the Snapchat 'Pixel' installed on a given website—and not Snap itself—that 'will automatically attempt to detect and … hash information we believe to be emails … before they're sent to Snap.'" MTD at 11-12:25-2. Effectively, Defendants are trying to draw a distinction between Snap the company and the service that Snap provides and operates. *See* FAC ¶ 38 (alleging "the SnapChat Pixel … is owned and operated by Snap"). This line-drawing has been rejected by California courts. *See Ambriz v. Google, LLC*, 2025 WL 830450, at *4 (N.D. Cal. Feb. 10, 2025) ("[I]t is Google, not [Google's software], that is alleged to have engaged in the conduct at issue here."); *cf. Yockey v. Salesforce, Inc.*, 688 F. Supp. 3d 962, 976 (N.D. Cal. 2023) ("Yockey alleges misconduct on the part of Salesforce as the provider, not on the part of its personnel.").

**B. Plaintiffs' E-Mail Addresses Were Communicated Within Defendants' Online Form And Are Thus "Contents"**

Next, Defendants argue that "Plaintiffs' email and IP addresses are not 'contents' in the first place." MTD at 10:20-21. To be clear, Plaintiffs are not arguing that their IP addresses are "contents." Instead, Plaintiffs argue that because their e-mail addresses were affirmatively communicated in form fields, rather than automatically populated, such information constitutes the "content" of Plaintiffs' communications. And courts routinely hold that "text entry … and information entered into form fields and text boxes—even when the user does not ultimately submit that information," *Tanner v. Acushnet Co.*, 2023 WL 8152104, at *3 (C.D. Cal. Nov. 20, 2023), is content information.

"'Contents' means information concerning the substance, purport, or meaning of [a] communication." *Price*, 712 F. Supp. 3d at 1360 (cleaned up). So, "[w]hether information is 'content' or 'record information' can depend in part on the manner in which the information is generated, as information that would otherwise be considered 'record information'—such as names, addresses, telephone numbers, and email addresses—may be 'contents' of a communication where the user communicates with a website by entering his information into a form provided by the website." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 518 (C.D. Cal. 2021). As such, while e-mail addresses on their own are not content information, "information may constitute 'contents' where 'the record is the subject of a communication.'" *Id.* (quoting *In re Zynga Priv. Litig.*, 750 F. 3d 1098, 1107 (9th Cir. 2014)).

*In re Zynga* is instructive. There, "[t]he Ninth Circuit approved the First Circuit's decision in *In re Pharmatrak*, 329 F. 3d 9, 15, 18-19 (1st Cir. 2003), where the First Circuit held that defendant had 'intercepted the content of the sign-up information customers provided to pharmaceutical websites, which included their "names, addresses, telephone numbers, [and] email addresses[]" and provided this information to third parties.'" *Price*, 712 F. Supp. 3d at 1360. The Ninth Circuit reasoned that "[b]ecause the users had communicated with the website by entering their personal medical information into a form provided by a website, the First Circuit correctly concluded that the defendant was disclosing the contents of a communication." *In re Zynga*, 750 F. 3d at 1107.

Following the Ninth Circuit, courts have found that information submitted in a form field amounts to content information even where the information would be record information on its own. *See*, *e.g.*, *Price*, 712 F. Supp. 3d at 1361 (information including "home address, phone number, [and] email address" was "contents" because it was "entered into an information field or text box"); *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 945 (N.D. Cal. 2023) ("data entered into forms" is contents).

An analogy is also useful. If the Court saw on its caller ID that "123-456-7890" was calling, that information would be "record" information because that identifies the sender of the communication, but not the message. Conversely, if the Court got on the phone and the other participant said, "this is 123-456-7890," that would be "contents" because phone number is the substance of the message. Because users here are typing e-mail addresses into form fields, Plaintiffs' allegations fall into the latter category. *See also Lineberry*, 2025 WL 551864, at *3 ("Browsing a specific product online is akin to calling the store and asking for information about that product, and everyone agrees that the latter counts as the 'content' of a communication.").

As a last point, even if Defendants are correct, the e-mail addresses would still be "addressing" information and thus fall within the ambit of CIPA § 638.51. *See* Argument § V, *infra*. Plaintiffs allege these claims in the alternative to one another. FAC ¶¶ 3-4; Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

### C. Defendants Aided, Agreed With, Employed, And Otherwise Enabled Snap And Salesforce To Wiretap Plaintiffs' Communications

Defendants argue that Plaintiffs failed to allege that Defendants' aided and abetted in the transmission of the data because they did "not plead that BioLife had knowledge of any such CIPA violation." MTD at 12:14. That is not the standard.

*Tate v. VITAS Healthcare Corp.*, 762 F. Supp. 3d 949 (E.D. Cal. Jan. 8, 2025), in instructive. There, the defendant argued that "it lack[ed] the requisite intent under an 'aiding and abetting' standard because it did not know that [the third party] was allegedly violating section 631(a)." *Id.* at 959. But Cal. Pen. Code § 631 does not include the word "abet." Instead, as the *Tate* court pointed out, "[t]he plain text of section 631(a) is unambiguous on this issue: the statute requires that a party

'aids, agrees with, employs, or conspires' with another party. It does not require a party aid *and* abet." *Id.* (emphasis in original). "Instead, to establish a violation a plaintiff need only prove that a party [] aided, agreed with, employed, or conspired with a third party [] as it violated section 631(a)." *Id.* (emphasis in original). Defendants' argument "goes beyond what the statute requires, and there is no basis to read in a common law standard of aiding and abetting when the statute itself is clear." *Id.*; *see also Doe v. Tenet Healthcare Corp.*, 2025 WL 1635956, at *15 (E.D. Cal. June 9, 2025) ("The statute does not require that a party aid and abet … Because [t]he statute as worded does not include an intent standard, the court considers whether [p]laintiffs have alleged that defendants aided, agreed with, employed, or conspired with [Meta].") (cleaned up); *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1130 (S.D. Cal. 2023) ("Defendant's contention that 'aids' means 'aiding and abetting' ignores the 'agrees with, employs, or conspires with' language of the clause."); *St. Aubin v. Carbon Health Techs., Inc.*, 2024 WL 4369675, at *8 (N.D. Cal. Oct. 1, 2024) ("The Court finds the approach in *Cousin* more persuasive because it more closely follows the language of the statute.").[2]

Thus, as *Tate* and these other decisions recognized, the plain language of CIPA § 631—which prohibited "aiding, agreeing with," or "employing" another to violate the statute—indicates CIPA § 631(a) was meant to apply to a much broader swath of non-criminal conduct, regardless of "specific intent." *See Cousin*, 681 F. Supp. 3d at 1129-30. To that end, "aid" should be interpreted as "to give assistance,"[3] "agrees with" as "to concur in opinion or purpose,"[4] and "employs" as "to make use of" or "to hire."[5] In short, a defendants violate the fourth clause of CIPA § 631(a) where they simply "enable" another's wrongdoing. *See Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("[T]he complaint adequately alleges that Moosejaw violated section 631 by *enabling* NaviStone's wrongdoing.") (emphasis added).

---

[2] *Esparza v. UAG Escondido AI Inc.*, 2024 WL 559241 (S.D. Cal. Feb. 12, 2024), ignored this plain statutory language and so should be disregarded

[3] *Aid*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/aid.

[4] *Agree*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[5] *Employ*, BLACK'S LAW DICTIONARY (11th ed. 2019).

Applying the correct standard here, Plaintiffs allege that "Defendants installed at least two third party trackers on the Website: (i) Evergage, which is owned and operated by Salesforce, (ii) and the SnapChat Pixel, which is owned and operated by Snap. Defendants integrate these third parties' 'software development kits' [] and 'application programming interfaces' [] into their Website." FAC ¶ 38. It was through this installation that the Third Parties wiretapped Plaintiffs' information. *Id.* ¶ 42. And Plaintiffs allege that Defendants installed these Third Party Trackers for financial benefit (*i.e.*, for use in Defendants' marketing and advertising operations). *See*, *e.g.*, *id.* ¶ 88 ("Salesforce's partnership with Defendants enables Defendants to share collected data with Salesforce's Marketing Cloud Advertising software, which helps target digital advertising campaigns across multiple platforms"); *id.* ¶ 99 ("The purpose of such transmissions is so companies like Defendants can better advertise and target consumers on Snap's social media platform by enabling Snap to learn who visits the companies' websites."); *id.* ¶¶ 91, 100. Accordingly, Defendants "aided, agreed with, employed, or otherwise enabled Salesforce and Snap to intercept consumers' communications with Defendants on the Website." *Id.* ¶ 115; *see also St. Aubin*, 2024 WL 4369675, at *8 (sustaining CIPA § 631 claim where defendant "chose to include Facebook Pixel" on its website, which "enable[d] Facebook to help Carbon Health with advertising" and "Carbon Health assisted Facebook with intercepting the identities and online activity of patients").

## V. PLAINTIFFS HAVE STATED A CLAIM FOR VIOLATION OF CIPA § 638.51

### A. CIPA § 638.51 Applies To Internet Tracking Technology

Defendants argue that "CIPA section 638.51 does not prohibit the alleged collection of internet communications at issue here." MTD at 13:1-2. Defendants specify that "a 'pen register' has long been understood to mean 'a mechanical device which records the numbers dialed from a telephone.'" *Id.* Federal courts adjudicating these claims beg to differ.

CIPA § 638.50(b) defines a "pen register" as a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." "Nothing in the statutory definition limits pen registers to those that operate the same way as a traditional phone pen register." *Shah*, 754 F. Supp. 3d at 929. On the contrary, the "California

Legislature[] chose[]" "expansive language" for the definition of a "pen register" that "the Court cannot ignore"—language that is "specific as to the type of data [collected]," but "vague and inclusive as to the form of the collection tool" (*i.e.* "device or process"). *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

Thus, federal courts have universally held that online trackers or tracking software such as the Trackers at issue here are "pen registers." *See, e.g.*, *Shah*, 754 F. Supp. 3d at 929 (agreeing with "[p]laintiffs' theory [] that the third-party Trackers operate as pen registers under the meaning of the statute because they are processes that record users' IP addressing information"); *Mirmalek v. Los Angeles Times Commc'ns LLC*, 2024 WL 5102709, at *3 (N.D. Cal. Dec. 12, 2024) ("[U]nder the inclusive language of CIPA's definition of a pen register, Plaintiff sufficiently alleges that the Trackers are a 'device or process…'"); *Moody v. C2 Educational Sys. Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley*, 684 F. Supp. 3d at 1050 (finding software constituted a "pen register"); *Heiting v. FKA Distributing Co.*, 2025 WL 736594, at *3 (C.D. Cal. May 15, 2025) (same); *Zarif v. Hwareh.com, Inc.*, 2025 WL 486317, at *12 (S.D. Cal. Feb. 13, 2025) (same); *Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921, 929 (C.D. Cal. 2025) (same); *Lesh,* 767 F. Supp. 3d at 40 (same).

Defendants argue that their narrow view of the statute is consistent with legislative intent. MTD at 13. But "the text of a law controls over purported legislative intentions unmoored from any statutory text," and "the Court may not replace the actual text with speculation as to Congress' intent." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024). And because the "text is clear," the Court's analysis "must end there." *Shah*, 754 F. Supp. 3d at 929.

Even incorporating legislative intent, Defendants are still wrong. "CIPA was passed, in part, because 'the development of new devices and techniques for the purpose of eavesdropping upon private communications [] has created a serious threat to the free exercise of personal liberties.'" *Lesh*, 767 F. Supp. 3d at 41 (quoting Cal. Pen. Code § 630). "In light of this intent, the California Supreme Court has instructed courts to interpret CIPA in the manner that 'fulfills the legislative purpose of CIPA by giving greater protection to privacy interests.'" *Matera v. Google Inc.*, 2016

WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016) (Koh, J.) (quoting *Flanagan v. Flanagan*, 27 Cal. 4th 766, 775 (2002)). "As such, courts have repeatedly held that [the] provisions of CIPA are not limited to the traditional versions of the tools at issue, based on the plain language of the statute, the California Supreme Court's pronouncements regarding the broad legislative intent underlying CIPA to protect privacy, and the California courts' approach to updating obsolete statutes in light of emerging technologies." *Shah*, 754 F. Supp. 3d 930-31 (cleaned up); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications."); *Gladstone v. Amazon Web Servs.*, 739 F. Supp. 3d 846, 856 (W.D. Wash. 2024) ("[T]he Court finds that 'device,' as used in [CIPA] Section 632, can include software."). Thus, applying CIPA § 638.50 to the Trackers *comports with* legislative intent, whereas Defendants' view contradicts it.

Finally, Defendants argue that "the California Legislature requires that an order authorizing the use of a pen register 'shall specify'—without exception—'[t]he number and, if known, physical location of the telephone line to which the pen register is to be attached' … Plaintiffs' attempt to expand CIPA's pen register provision to internet communications would make that requirement a nullity." MTD at 13:22-23. Defendants, however, are not citing to the definition of a "pen register," which is contained in Cal. Pen. Code § 638.50. Instead, Defendants are citing Cal. Pen. Code § 638.52. And CIPA § 638.52 "merely lists requirements relating to a particular type of pen register: one that is installed on a telephone line … But that does not alter the statutory definition of a pen register stated in § 638.50(b) or the prohibition on non-law enforcement use of such pen registers." *Shah*, 754 F. Supp. 3d at 930; *see also Moody*, 742 F. Supp. 3d at 1076 ("Though § 638.52 refers to pen registers and trap and trace devices as physically attached to telephone lines, the definitions set forth under § 638.50 do not state any such requirement."); *Lesh*, 767 F. Supp. 3d at 41 (rejecting same argument as Defendant brings here and noting "[t]he Court will not read the term 'telephone' into Section 638.50 just because the word is used in another section of the statute that bears little relevance here"). Thus, the two provisions can be read in harmony.

**B. The Trackers Recorded Or Decoded Information Transmitted From Plaintiffs' Computers, Per The Plain Text Of The Statute**

Defendants next argue that "Plaintiffs [] cannot establish that the Salesforce Evergage and Snapchat Pixel tools are 'pen registers,' because they allege that these tools collected only *their* email and IP addresses, not the 'IP address and related information' of the BioLife 'website accessed.'" MTD at 14:5-8. The plain text contradicts Defendants' argument. Cal. Pen. Code § 638.50(b) defines a "pen register" as a "device or process" that "records or decodes … information … transmitted by an instrument or facility *from which* a wire or electronic communication is transmitted." Again, "[n]othing in the statutory definition limits pen registers to those that operate the same way as a traditional phone pen register." *Shah*, 754 F. Supp. 3d at 929. Thus:

> [b]y the plain meaning of § 638.50(b), collection of the recipient phone number or IP address is not a required element. All that is required is that the Trackers record addressing information *transmitted by the user's computer or smartphone in connection with the outgoing HTTP request to [Defendant's] website*, regardless of whether that addressing information pertains to the sender or the recipient of the communication at issue.

*Id.* (emphasis added). Plaintiff here has "so alleged." *Id.*; *see also*, *e.g.*, FAC ¶¶ 6, 8, 42, 47, 57; *Mirmalek*, 2024 WL 5102709, at *4 ("Plaintiff alleges that the instruments or facilities are users' computers or smartphones. Additionally, Plaintiff alleges that users' devices transmit electronic communications in the form of Hypertext Transfer Protocol [] or GET requests to load Defendant's website.) (cleaned up); *Lesh*, 2025 WL 563358, at *4 ("Such Trackers prompt the browser to send the user's IP address. These facts adequately allege the transmission of an electronic communication."); *Moody*, 742 F. Supp. 3d at 1077 (same where software collected "browser and device data sent automatically upon visiting the Website.").

**C. IP Addresses And E-Mail Addresses Are "Addressing" Information, Whose Collection By Third Parties Is Prohibited Without Consent**

Defendants argue that "Plaintiffs' claim independently fails to the extent premised on the alleged collection of their IP addresses, because 'there is no privacy interest in IP addresses provided to a service provider or website.'" MTD at 14:16-17. As an initial matter, Defendants do *not* dispute that an e-mail address is "routing, addressing, or signaling information," and thus, falls within the purview of CIPA § 638.50. Regardless, the weight of authority has found that IP addresses constitute

"routing, addressing, or signaling information" under the CIPA. *Shah*, 754 F. Supp. 3d at 929 ("[T]he IP addresses collected by the Trackers fall within the statutory definition of 'addressing' information."); *Mirmalek*, 2024 WL 5102709, at *4 ("Plaintiff adequately alleges that the Trackers record addressing information in the form of IP addresses."); *Lesh*, 767 F. Supp. 3d at 40 ("[T]he IP addresses collected by the Trackers qualify as 'addressing information' under the statute."). Indeed, the Ninth Circuit held almost twenty years ago that "IP addresses constitute addressing information" under the federal pen register act. *United States v. Forrester*, 512 F.3d 500, 511 (9th Cir. 2008). This is so because IP addresses "determine[] the general geographic coordinates of the user who is accessing a website" (*i.e.*, "addressing" information), and are "sending or directing the user's communication from the router in their home or work to the website they are communicating with" (*i.e.*, "routing" or "signaling" information). FAC ¶¶ 70-71.

Defendants' argument appears to be based on the red herring that because websites themselves collect IP addresses for other purposes, that cannot fall within the purview of the CIPA. MTD at 14. As numerous courts have found, that mischaracterizes Plaintiffs' claim. Plaintiffs' claim is *not* that Defendants themselves collected IP addresses to "communicate" with users. Instead, it is that Defendants installed the Third Party Trackers, which caused the *Third Parties* to collect Plaintiffs' information, and those Trackers were then used by Defendants and the Third Parties to identify Plaintiffs and conduct advertising and marketing activities. *See* FAC ¶¶ 2, 6, 8, 42, 47, 57, 74-75, 77, 82-100. That is an important distinction, and one that courts have found dispositive. *See*, *e.g.*, *Shah*, 754 F. Supp. 3d at 932 ("A user who consents to disclose their IP address to Fandom as part of accessing its website does not necessarily consent to disclose their IP address to the third parties operating the Trackers."); *Conohan v. Rad Power Bikes Inc.*, 2025 WL 1111246, at *6 (C.D. Cal. Apr. 3, 2025) (following *Shah* on this point); *Rodriguez*, 762 F. Supp. 3d at 930 (rejecting same argument Defendant makes here where the plaintiff alleged her "information was sent to third parties, not just Defendant"). And Plaintiffs allege "that the tracking software captured more than just their IP address," but also their "email addresses." *Id.* at 930.

Defendants' citations should not persuade. Several of Defendants' cases "involve situations where users were directly communicating with the party alleged to be operating the pen register and

voluntarily sent that party their IP address." *Shah*, 754 F. Supp. 3d at 932 n.3; *see also Licea v. Hickory Farms LLC*, 2024 WL 1698147, at *4 (Cal. Super. Ct. Mar. 13, 2024) (pinning analysis on collection of IP address "for purposes of connecting the website," rather than collection by third party); *Aviles v. Liveramp, Inc.*, 2025 WL 487196, at *3 (Cal. Super. Ct. Jan. 28, 2025) ("Plaintiff at most alleges that Defendant's Website collects the IP addresses and other information of visitors incoming to the website…"); *Casillas v. Transitions Optical, Inc.*, 2024 WL 487370, at *1 (Cal. Super. Ct. Sept. 9, 2024) (alleging that "Defendant [*i.e.*, the website operator] secretly … collect[ed] Plaintiff's IP address") (cleaned up). *Casillas* also wrongly turns on analysis under the Fourth Amendment. *See Casillas*, 2024 WL 4873370, at *6-7 (relying on decisions concluding that warrantless searches of IP addresses were not searches under the Fourth Amendment). And "[c]ases regarding the limits of the Fourth Amendment have no bearing on whether an individual has standing to sue under CIPA, as CIPA provides protection beyond the floor set by the Fourth Amendment." *Lesh*, 767 F. Supp. 3d at 39; *see also Greenley*, 684 F. Supp. 3d at 1051 (finding "[t]he fact that law enforcement can install a warrantless pen register without offending the Fourth Amendment is immaterial" to the plaintiff's CIPA claim). Finally, *Rodriguez v. Plivo Inc.*, 2024 WL 514413 (Cal. Super. Ct. Oct. 2, 2024), cited the same inapposite authorities and ignored the plain text of the statute, reasoning that federal courts have roundly rejected. *See* Argument §§ V.A-B, *supra*.[6]

Defendants also raise a larger policy argument that "'[t]he pen register statute did not, and does not, criminalize the process by which all website communicate with all users who choose to access them.'" MTD at 14:15-16 (quoting *Casillas*, 2024 WL 4873370, at *6). Again, that is not Plaintiffs' allegation here. Instead, it is that Defendants installed Trackers that enabled *Third Parties* to collect information about Plaintiffs, de-anonymize them, and use their information in marketing

[6] Of note, all four of Defendants' authorities involved a "tester" plaintiff represented by the same counsel who has been roundly criticized for serial litigation and outlandish comparisons. *See*, *e.g.*, *Casillas*, 2024 WL 4873370, at *2 ("The FAC here is one of many nearly identical complaints filed by a self-described tester plaintiff"); *Byars v. Hot Topic, Inc.*, 656 F. Supp. 3d 1051, 1059 (C.D. Cal. 2023) ("Plaintiff, and her counsel, Scott Ferrell, are serial litigants bringing numerous 'cookie cutter' lawsuits under CIPA…"); *id.* at 1057 n.4 ("Plaintiff goes as far as to compare herself to Rosa Parks, who she claims was acting as a 'tester' … Plaintiff's self-aggrandizing comparison trivializes Rosa Parks … [and] was not well-received by the Court."). This should give the Court a flavor for the paucity of pleadings at issue in those cases.

and advertising activities without prior consent. None of that has anything to do with "the process by which all website communicate with all users." And the CIPA does not *per se* prohibit Defendants' conduct; it simply must procure its users' prior consent to do so. *See Lesh*, 767 F. Supp. 3d at 42-43 (evaluating, although rejecting, consent defense to a CIPA § 638.51 claim); *see also TBG Ins. Serv. Corp. v. Super. Ct.*, 96 Cal. App. 4th 443, 450 n.5 (2002) ("Zieminski's consent [i]s a complete defense to his invasion of privacy claim."). "This is not hard to accomplish, as the enormous volume of commerce on the Internet attests." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1036 (7th Cir. 2016). Regardless, "[t]o the extent that [Defendants] believe[] the statute may impose too many burdens when applied to the realities of modern technologies … th[at] question … ultimately rests with the Legislature, not the courts." *Shah*, 754 F. Supp. 3d at 932-33.

## VI. PLAINTIFF WOOTEN'S CLAIMS ARE TIMELY

Defendants argue that because Plaintiff Wooten "waited to bring this lawsuit for nearly a year after the limitations period expired in February 2024, his claims are time-barred." MTD at 15:1-2. The delayed discovery rule says otherwise. "To invoke the delayed discovery doctrine, a plaintiff must plead facts to show the '(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence.'" *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 901 (N.D. Cal. 2023) (quoting *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 808 (2005)). "A claim may be dismissed as untimely pursuant to a 12(b)(6) motion only when the running of the statute [of limitations] is apparent on the face of the complaint." *Gaige v. Exer Holding Co., LLC*, 2025 WL 559719, at *3 (C.D. Cal. Mar. 2, 2025) (citing *U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*, 720 F. 3d 1174, 1178 (9th Cir. 2013)).

Here, Plaintiff Wooten alleges that "he was never appraised of any Third Party trackers located on Defendants' Website," "[h]e was never required to view, agree to, nor consent to any privacy policy at sign up," and that "[n]either Snapchat, Evergage, nor Salesforce are ever referenced in Defendants' Privacy Policy and, since Plaintiffs' Counsel had to conduct a "dynamic analysis" to discover their function on the Website, Plaintiff Wooten could not have reasonably discovered the violation on his own." FAC ¶ 7. This is sufficient. *See*, *e.g.*, *Gaige*, 2025 WL 559719, at *3 (finding claims were timely where "[p]laintiff alleges that he did not know and had no way of knowing that

his personally identifiable information [] and/or personal health information [] was intercepted and unlawfully disclosed to … third parties because Defendant kept this secret”).

Moreover, even if a reasonable user would be aware that Snap and Salesforce were collecting information from the user *after* their account was created or *after* consent was given (and they would not be here), there would be no reason to suspect that such information was collected *prior to* and *without* any affirmative consent. *Franklin v. Ocwen Loan Serv., LLC*, 2018 WL 5923450, at *3 (N.D. Cal. Nov. 13, 2018) (applying delayed discovery doctrine where “[e]ven if plaintiff became aware during the course of certain calls that those calls were being recorded, it does not follow that plaintiff should have known or inquired as to whether the calls were being illegally recorded before he gave his consent.”). Thus, there was no notice of the violation for the same reasons Defendants did not meet their burdens as to showing notice and assent. *See* Argument § I, *supra*.

Defendants’ authorities are inapposite. In *Javier*, 2023 WL 3933070, at *2, unlike here, there was notice of and assent to the privacy policy, which disclosed the at-issue conduct. Also unlike here, the plaintiff in *Javier* “assumed” the website operator (as opposed to the third party) “wrongly intercepted his information,” and thus, “had constructive notice of the Privacy Policy.” *Javier*, 649 F. Supp. 3d at 902. The same reasoning distinguishes *Maddalena v. Tootle*, 2013 WL 5491869, at *4 (C.D. Cal. Oct. 1, 2013), where the plaintiff admitted she “discover[ed] the illegal use of … spyware on her computers,” and thus, had actual knowledge of the violations at issue. *Bliss v. CoreCivic, Inc.*, 978 F. 3d 1144, 1149 (9th Cir. 2020) fails for the same reason because the plaintiff “received discovery … that included recorded calls.”

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants’ Motion. If the Court grants the Motion in any respect, Plaintiff respectfully requests leave to amend. *See Roney v. Miller*, 705 F. App’x 670, 671 (9th Cir. 2017) (holding lower court erred in denying leave to amend after dismissing first amended complaint).

Dated: July 7, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Joshua B. Glatt*
Joshua B. Glatt

L. Timothy Fisher (State Bar No. 191626)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
jglatt@bursor.com

*Attorneys for Plaintiffs*